# United States District Court
## For The District of Columbia

| | |
|---|---|
| **United States of America,** | |
| **v.** | **No. 19-cr-194 (KBJ)** |
| **Robert Leake,** | |
| **Defendant.** | |

## Emergency Motion for Release from Custody Due to Immediate Threat Posed By Covid-19 Pandemic

**TABLE OF CONTENTS**

I.   Introduction………………………………………………………………………………...3

II.  Background………………………………………………………………………………7

   A.  COVID-19 is a national crisis without precedent in our lifetime………………………7

   B.  COVID-19 is an extremely dangerous disease……………………………………………9

   C.  COVID-19 presents a great threat to our nation's prisons and jails……………………12

   D.  The DOC has proven it is ill-equipped to handle this crisis and has not
       protected inmates' safety………………………………………………………………… 14

III. Discussion…………………………………………………………………………….....19

   A.  The Bail Reform Act empowers the Court to release Mr. Leake for
       COVID-19 related reasons…………………………………………………………...19

      i.  § 3142(f) empowers the Court to release Mr. Leake on home confinement…........19

         1.   The third factor now favors release……………………………...…………..20

         2.   The fourth factor now favors release……………………………………… 21

      ii.  Alternatively, § 3142(i) empowers this Court to temporarily release Mr. Leake
        on home confinement………………………………………………………… 26

   B.  The Fifth Amendment Due Process Clause empowers the Court to release
       Mr. Leake for COVID-19 related reasons…………………………………………………29

   C.  The Eighth Amendment empowers the Court to release Mr. Leake for
       COVID-19 related reasons………………………………………………………………31

IV. Conclusion……………………………………………………………………………34

Robert Leake, through counsel, respectfully moves this Court to order his immediate release from custody under 18 U.S.C. § 3142 and the Fifth and Eighth Amendments to the United States Constitution.

## I.  INTRODUCTION

Circumstances in the United States and the DC Jail have radically changed since Mr. Leake was detained. Mr. Leake was charged with gun and drug offenses and conceded his detention on June 12, 2019.  Since then, COVID-19 has emerged as a global and national health emergency.  At least 20 inmates inside the D.C. Department of Corrections ("DOC") have tested positive for COVID-19.  At least five federal prisoners (ages 43, 49, 56, 57, and 66) have died, seven more are in intensive care with four on ventilators, from an outbreak that occurred *inside of just one prison*—more have tragically died nationwide.[1]  And courts all over the country, including in this district, have started acknowledging the dangerousness that COVID-19 poses to our detention facilities and started ordering the immediate release of vulnerable prisoners.[2]

---

[1] Sadie Gurman et al, *Coronavirus Puts a Prison Under Siege*, WSJ (April 6, 2020), https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences-11586191030.

[2] *See, e.g.*, *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Grobman*, No. 18-cr-20989, ECF No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Kennedy*, No. 5:18-cr-20315, ECF No. 77 (Mar. 27, 2020) (post-plea presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is *necessary* for Defendant to prepare his pre-sentence defense"); Min. Order, *United States v. Michaels*, No. 8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25,

Judge Moss, for example, recently released a defendant charged with both gun and drug offenses from pretrial detention in light of the COVID-19 pandemic. *See* Min. Order, *United States v. Brent Jaffee*, No. 19-cr-88 (RDM) (D.D.C. Mar. 26, 2020). As he stated,

> [T]he Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement. All responsible government agencies have advised of the risk of transmission posed by large gatherings, and the Court understands the defendant is housed in a unit with dozens other detained individuals. The risk of the spread of the virus in the jail is palpable, and the risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real. On the other hand, if defendant is confined at home and has contact only with his wife, the risk to him (including his heightened risk due to the underlying health condition he disclosed to the Court) and to others will be significantly reduced).

---

2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, No. 19-cr-297, 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, ___ F. Supp. 3d___ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrique*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) ("*[t]he nature* of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *Coronel v. Decker*, 20-cv-2472-AJN, ECF No. 26 (Mar. 27, 2020) (granting TRO and releasing from immigration detention facility in light of COVID-19); *Basank v. Decker*, 20-cv-2518 (S.D.N.Y. Mar. 26, 2020) (same).

*Id.*; *see also United States v. McLean,* No. 19-cr-380-RDM, ECF No. 21 (D.D.C. Mar. 28, 2020) (releasing defendant charged with multiple firearms and controlled substance offenses because "COVID-19 . . . not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Harris*, No. 19-cr-356-RDM, ECF No. 36 (D.D.C. Mar. 26, 2020) (releasing healthy 20-year-old pending sentencing that was charged with a mandatory minimum in light of COVID-19).

Other judges in this district have similarly ordered the immediate of vulnerable inmates because of the COVID-19 pandemic. *See, e.g.*, *United States v. Davis*, No. 19-cr-292-JDB, ECF No. 157 (D.D.C. April 6, 2020) (releasing 28-year-old defendant with chronic bronchitis charged with distributing over 280 grams of crack cocaine because of COVID-19); *United States v. Meekins*, No. 18-cr-222-APM, ECF No. 75 (D.D.C. Mar. 31, 2020) (releasing defendant pending sentencing, with three pending assault charges that allegedly occurred while on release, due to extraordinary danger COVID-19 poses to individuals in detention); *United States v. Appiah*, No. 19-cr-361-BAH (D.D.C. Mar. 26, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH (Mar. 28, 2020). *But see United States v. Lee*, No. 19-cr-198, 2020 WL 1541049 (D.D.C. Mar. 30, 2020).

They have done so for good reason. Scientists worldwide advise that the two most important steps to take to limit COVID-19's spread are good hygiene and social distance. But both are nearly impossible at the D.C. Jail. The jail is notoriously unhygienic, with little access to soap and water. Prisoners have no way to practice "social distancing" or other protective measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection; instead, they are forced to put themselves in great danger by sitting in the communal barracks, using the communal bathroom, and eating in

the communal cafeteria.  And, inmates do not live under quarantine—people cycle in and out of the facility daily, and people who work in the facilities leave and return daily, usually without screening.  All of these individuals potentially can carry the virus from the facility to their homes and communities, and then return back, bringing new germs with them.  For this reason, public health experts are in agreement that it is absolutely critical to reduce incarceration in order to contain the spread of this virus to both the incarcerated population and the community at large. *See* Ex. C, Beyrer Dec. ¶ 15; *see also* Exs. A-F.

There are now 20 inmates in the DC Jail who have tested positive for COVID-19.  Now, each day in custody brings greater and greater risks to Mr. Leake. The World Health Organization reports that "[i]ndividuals at highest risk for severe disease and death include people . . . with underlying conditions such as hypertension, diabetes, cardiovascular disease, *chronic respiratory disease* and cancer."[3] The Center for Disease Control ("CDC") has similarly recognized that people of all ages with underlying medical conditions, particularly those with moderate asthma, are at a heightened risk of severe illness from COVID-19.[4]  Mr. Leake suffers from chronic respiratory disease (asthma), meaning that he is "at highest risk for severe disease and death." Worse yet, he was housed in the same unit as a person who tested positive for COVID-19 (Raymond Avanti), and despite having flu-like symptoms, he has not been tested or

---

[3] *See Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization, at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf. (emphasis added).

[4] *See Groups at Higher Risk for Severe Illness*, CDC (updated April 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

quarantined.  Right now, both Mr. Leake's own life, the safety of the other inmates and DOC staff, and the safety of the community will best be protected by his release.

## II.  BACKGROUND

### A.  COVID-19 is a national crisis without precedent in our lifetime.

As the Court is well aware, COVID-19 has caused a worldwide global pandemic.  As of April 6, 2020, SARS-COV-2, a novel coronavirus causing COVID-19, has infected over 1,210,956 people worldwide, leading to at least 67,594 deaths, and 8,358 deaths in the United States.[5] Those numbers grow daily.  The President has declared a national emergency[6] and has advised the public to avoid gathering in groups of more than 10 people.[7]  Our country is still behind the curve on community testing, and we do not know the true extent of community spread.[8]  Because of the virus' long latency period, studies show that "stealth" transmission by infected persons with low or no symptoms has played a "major role" in the pandemic.[9]  New data published in the

---

[5] *See Coronavirus disease 2019 (COVID-19): Situation Report—77*, World Health Org. (Apr. 6, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports.

[6] Taylor Telford, *U.S. markets surge as massive economic stimulus plan takes shape to offset coronavirus*, Wash. Post, (March 18, 2020) , https://www.washingtonpost.com/business/2020/03/17/us-stock-markets-today-fed-funds/.

[7] Kevin Liptak, *White House advises public to avoid groups of more than 10*, CNN, (March 16, 2020), https://www.cnn.com/2020/03/16/politics/white-house-guidelines-coronavirus/index.html.

[8] Sheri Fink, *'It's Just Everywhere Already': How Delays in Testing Set Back the U.S. Coronavirus Response*, N.Y. Times, (March 10, 2020), https://www.nytimes.com/2020/03/10/us/coronavirus-testing-delays.html.

[9] Melissa Healy, *How 'silent spreaders' are fueling the coronavirus pandemic*, L.A. Times (March 17, 2020), https://www.latimes.com/science/story/2020-03-17/how-silent-spreaders-are-fueling-the-coronavirus-pandemic; CDC Emerging Infectious Diseases, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020,* (March 12, 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article ("persons with asymptomatic COVID-19 can spread the virus").

New England Journal of Medicine found that the highly-contagious "virus can remain viable and infectious in aerosols for hours and on surfaces up to days."[10]

Mayor Muriel Bowser declared a Public Health Emergency in the District of Columbia.[11] She issued an order identifying COVID-19 as an imminent threat to the health, safety and welfare of D.C. residents, requiring emergency protective actions to be taken by the D.C. Government.[12] She further ordered all non-essential businesses in the District of Columbia to close.[13]  Most recently, she issued a stay-at-home order for the District of Columbia.[14]  As of April 5, 2020, Washington, D.C. reported 998 confirmed cases of COVID-19 and 22 deaths associated with it.[15] These numbers are increasing daily.

The virus is spreading exponentially. Overall, COVID-19's basic reproduction number is somewhere between 2.4 and 3.8, which means that "each newly infected person is estimated to infect on average 3 additional persons." Ex. C, Beyrer Decl. ¶ 10.  The World Health

---

[10] Neeltje van Doremalen, et. al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Med., (March 17, 2020), nejm.org/doi/10.1056/NEJMc2004973.

[11] D.C. Government (March 11, 20202), at https://coronavirus.dc.gov/release/mayor-bowser-declares-public-health-emergency.

[12] D.C. Government, Order of the Mayor (March 11, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.DeclarationofPublicHealthEmergency03.11.20.pdf.

[13] D.C. Government, Order of the Mayor (Mach 24 2020), https://coronavirus.dc.gov/release/mayor-bowser-orders-closure-non-essential-businesses.

[14] D.C. Government, Order of the Mayor, (Mar. 30, 2020), https://mayor.dc.gov/release/mayor-bowser-issues-stay-home-order.

[15] *Latest coronavirus test results in DC, Maryland and Virginia,* Wtop news, (April 4, 2020) https://wtop.com/local/2020/04/coronavirus-test-results-in-dc-maryland-and-virginia/ (last visited April 5, 2020).

Organization's ("WHO") epidemic curve from April 3, 2020, illustrates the virus's alarming

acceleration rate:

Figure 1. Epidemic curve of confirmed COVID-19, by date of report and WHO region through 3 April 2020



**B.   COVID-19 is an extremely dangerous disease.**

COVID-19 is an extremely dangerous disease.  There is no known vaccine or cure.[16]

People in all age brackets are at risk of serious injury and death from COVID-19.  Although the

disease is typically more severe among older people, recent CDC data shows adults aged 20-44

are at severe risk as well:

> Early reporting on the impacts of COVID-19, based in part on preliminary data
> emerging from China, seemed to indicate that the virus' impact would remain
> relatively mild for younger people. Recent data released by the CDC suggests that

---

[16] *What You Need To Know About Coronavirus Disease 2019 (COVID-19)*, CDC (2020),
https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

this initial narrative is incorrect, and that adults aged 20-44 also face a risk of experiencing severe health outcomes as a result of contracting the disease.

*See* Ex. D, Stern Decl. at ¶ 14.  Nearly 40 percent of people requiring hospitalization due to

COVID-19 were between the ages of 20 to 54.  *Id.*

For people who contract COVID-19, the symptoms can be extremely severe.  Dr. Meyer

writes that "[s]erious illness occurs in up to 16% of cases, including death." Ex. E, Meyer Decl. ¶

23.  COVID-19 can cause intense pain, and recent research suggests that, in addition to the short-

term risk of death posed by COVID-19, contracting the virus can lead to other serious long-term

medical conditions, including cardiovascular disease and permanent reduction of lung function.[17]

As one respiratory physician explained, COVID-19 causes the lungs to "become filled with

inflammatory material" and "are unable to get enough oxygen to the bloodstream."[18]  This leads

to acute respiratory distress syndrome, in which fluid displaces the air in the lungs.  The

sensation of that illness is akin to being drowned.[19]

Some individuals who have survived the illness experienced fatigue so extreme they

cannot get out of bed or walk to the bathroom and a cough severe enough to prevent sleep.[20]  In

more serious forms, the individual can experience excruciating pain, days or weeks of fever and

chills, uncontrollable diarrhea and inability to keep down food or water, and extremely labored

---

[17] Tian-Yuan Xiong et al., *Coronaviruses and the Cardiovascular System: Acute and Long-Term Implications*, European Heart Journal, at 1 (2020).

[18] Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus*, The Guardian, (Mar. 24, 2020), https://www.theguardian.com/world/2020/apr/01/what-happens-to-peoples-lungs-when-they-get-coronavirus-acute-respiratory-covid-19.

[19] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica, (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[20] *Id.*

breathing requiring oxygen therapy.[21] The most severe forms—of which symptoms such as vomiting and diarrhea are thought to be early signs—require hospitalization and often artificial ventilation to preserve life.  Some patients are placed in medically induced comas for such treatment.  Some do not survive.

The available data from the CDC to date shows that, in total, 20.7 to 31.4 percent of people who tested positive for COVID-19 require hospitalization, 4.9 to 11.5 percent require admission to the ICU, and 1.8 to 3.4 percent die.[22] The WHO estimates that the morality rate is higher—between 3 and 4 percent.[23]  These rates dramatically increase based upon environmental and demographic risk factors.  For example, across all age groups, COVID-19 kills:

- 13.2% of people with cardiovascular disease

- 9.2% of people with diabetes

- 8.4% of people with hypertension

- 8% of people with chronic respiratory disease

- 7.6% of people with cancer[24]

---

[21] Leah Groth, *Is Diarrhea a Symptom of COVID-19? New Study Says Digestive Issues May Be Common With Coronavirus*, Health (March 20, 2020), https://www.health.com/condition/infectious-diseases/coronavirus/is-diarrhea-a-symptom-of-covid-19.

[22] *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020*, CDC, at tbl. (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w.

[23] *Coronavirus Disease 2019 (Covid-19) Situation Report – 46*, World Health Org, at p. 2 (2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200306-sitrep-46-covid-19.pdf?sfvrsn=96b04adf_2.

[24] *See* World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

### C. COVID-19 presents a great threat to our nation's prisons and jails.

Incarceration poses a grave public health threat during this crisis. Much like cruise ships and nursing homes, jails are extremely dangerous in a pandemic, given the impossibility of social distancing in a confined space.[25]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[26]

"According to health experts, it is not a matter of if, but when, this virus breaks out of jails and prisons."[27]  Recent data shows that positive cases within the federal prison population are beginning to exponentially escalate:



---

[25] Dr. Jeffrey Keller, *COVID-19 in Jails? It Might Get Ugly,* Medpage, (March 12, 2020), https://www.medpagetoday.com/blogs/doing-time/85366.

[26] *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY; *see also* Laura M. Maruschak et al., *Pandemic Influenza and Jail Facilities and Populations,* 99 Am. J. Pub. Health Supplement 2 (2009) (urging, in regard to the flu, that "During a pandemic, jail medical services will likely be insufficient to treat large numbers of sick inmates; further, local hospitals may be overburdened and unable to admit inmates who are seriously ill with influenza.").

[27] Dr. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, The New York Times (March 16, 2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.amp.html.

The recent data also shows that the percentage of people infected inside the BOP has increased at a rate that far exceeds the national average:

| Date | Number of BOP Cases | BOP Percentage Increase Since 3/20/2020 | National Percentage Increase Since 3/20/2020 | Number of U.S. Cases |
|---|---|---|---|---|
| 3/20/2020 | 2 | 0% | 0% | 18,747 |
| 3/21/2020 | 3 | 50% | 31% | 24,583 |
| 3/23/2020 | 6 | 200% | 135% | 44,183 |
| 3/24/2020 | 9 | 350% | 190% | 54,453 |
| 3/26/2020 | 18 | 800% | 355% | 85,356 |
| 3/27/2020 | 27 | 1250% | 451% | 103321 |
| 3/29/2020 | 38 | 1800% | 651% | 140904 |
| 3/30/2020 | 52 | 2500% | 772% | 163539 |
| 3/31/2020 | 59 | 2850% | 892% | 186101 |
| 4/1/2020 | 94 | 4600% | 1036% | 213144 |
| 4/2/2020 | 114 | 5600% | 1176% | 239279 |
| 4/3/2020 | 141 | 6950% | 1379% | 277205 |
| 4/4/2020 | 174 | 8600% | 1526% | 304826 |
| 4/5/2020 | 197 | 9750% | 1665% | 330891 |
| 4/6/2020 | 259 | 12850% | 1845% | 364723 |

As this data reflects, conditions of confinement create the ideal environment for the transmission of a highly contagious disease such as COVID-19.  Jails are notoriously unhygienic, with little access to soap and water.  Prisoners have no way to practice "social distancing" or other protective measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection.  People cycle in and out of pretrial facilities daily, and people who work in the facilities leave and return daily, usually without screening. All of these individuals potentially can carry the virus from the facility to their homes and communities, and then return back, bringing new germs with them.

Thus, when outbreaks occur in jails, this leads directly to increased spread beyond the confines of jail. *See* Ex. C, Beyrer Dec. ¶ 12. "It is therefore an ***urgent priority*** in this time of national public health emergency to reduce the number of persons in detention as quickly as possible." Ex. C, Beyrer Dec. ¶ 17 (emphasis added).

### D. The DOC has proven it is ill-equipped to handle this crisis and has not protected inmates' safety.

COVID-19 has entered the DOC.  To date, 20 people have tested positive.  This is notable because only two weeks ago, "as of March 22, 2020, the DOC reported that there were no known positive tests by inmates and indeed no inmates who were symptomatic."  *See* Gov't Opp. in *United States v. Meekins*, No. 18-cr-222-AMP, ECF No. 70 at 4 n.1 (D.D.C. 2020) (claiming that "[t]he defendant renders a conclusory opinion that DOC is simply unsafe" and that the "DOC is continuing to ensure its employees and its inmates' safety.").  The number of positive cases inside the DOC has already exponentially escalated: one positive test on March 25, to two positive tests on March 27, to four on March 28, to six on April 1, to twelve cases on April 2, to fourteen on April 4; to eighteen on April 5; to *twenty* positive cases on April 6, 2020.  These numbers are certainly an undercount, as the DOC has conducted limited testing and these numbers do not include positive staff members.

On March 20, 2020, the union representing correctional officers unanimously voted "no confidence" in DOC's ability to handle COVID-19.[28]  Shortly after, on March 27, 2020, the DOC attempted to reassure the public that it has taken "myriad precautions for the protection of

---

[28] Sophie Kaplan, *Union votes 'no confidence' in D.C. Jail leaders for handling of COVID-19*, The Washington Times (Mar. 20, 2020), available at https://www.washingtontimes.com/news/2020/mar/20/union-votes-no-confidence-dc-jail-leaders-handling/.

14

detainees—for example, it has 'suspended all in-person visits, programming, and volunteer activities at its facilities'; asked its medical staff to 'meet with each housing unit and officer roll call'; 'enhanced cleaning efforts, especially within common areas'; 'ordered additional cleaning and sanitation supplies, including protective gloves, masks and clothing for staff'; initiated two-hour cleaning of the entire facility (sanitizing and reminding people to wash their hands)'; suspended 'off-unit religious services, off-unit activities, and barbering/cosmetology services'; and diminished 'out-of-cell time (minimum of 2.5 hours daily) to reduce the number of social contracts.'" *United States v. Lee*, 2020 WL 1541049, at *6 (quoting *Coronavirus Prevention*, D.C. Department of Corrections (March 27, 2020), https://perma.cc/L59Z-WG43).

The government has repeatedly touted these new measures as a basis to continue detaining individuals and several courts have relied these assurances when denying requests for release. *See, e.g.*, *id.* at *6 (noting that the "Court can imagine in which temporary release might be warranted notwithstanding the lack of any individualized reason for releasing the particular detainee, such as the potentially compelling generalized reason of indifference, ineptitude, or sheer inability on the part of corrections authorities to ensure the safety of the prison's population.  But the record here does not yet support any such justification; to the contrary . . . DOC has moved intentionally and swiftly to take myriad precautions for the protection of detainees."); Min. Order, *United States v. Smith*, 19-cr-324-BAH (D.D.C. Mar. 23, 2020) ("The risk presented by the pandemic is clearly serious, and the Court acknowledges that risk may be greater in a jail environment where defendants are housed in close proximity to one another. As the government points out, however, the D.C. Department of Corrections has taken aggressive precautions to prevent the spread of the virus within the facility where defendant is detained").

The problem, however, is that the DOC has not actually implemented these measures inside the jail.  Because of this, on March 30, 2020, the Public Defender Service and ACLU initiated a class action lawsuit against the DOC for its failures to implement protective measures to ensure the safety of those in its custody.  *See Banks et al v. Booth et al*, No. 20-cv-849-CKK, ECF No. 1 (D.D.C. Mar. 30, 2020).  The complaint alleges the following failures of the DOC:

- DOC has not implemented the required social distancing policies, and in fact, have encouraged actions that run directly counter to social distancing protocols.

- There is no screening protocols for new residents coming into the jail.

- There is no soap, hygiene supplies, or paper towels available in common areas, recreational areas or food preparation areas.

- Residents were provided a single bar of soap, but some residents have already used their single bar and others are not using it because they do not know if or when additional soap will be provided.

- The DOC refuses to provide hand sanitizer to residents.

- Cells are double occupancy and toilets without lids are within a few feet from the beds. There are no cleaning supplies distributed to clean residents' cells.  On at least one unit, a closet full of cleaning supplies and clean rags is present, but residents are told they will be punished if they attempt to access or use those supplies to clean the unit, their own cells, or their hands and bodies

- Air circulation is minimal, especially when cells are locked down.

- Medical response to reports of symptoms often takes days after a resident's initial report.

- The supposed "quarantines" performed have been in name only.  Suspected positive cases are housed two to a cell and have been ineffective to prevent the spread of the virus.

*See id.* at 17-22.

Many of these allegations were subsequently corroborated by an unprecedented source: the Fraternal Order of Police for the DOC Labor Committee ("FOP/DOC"), which represents the correctional officers for the DOC.  Specifically, the FOP/DOC filed an amicus curiae *in*

*support* of PDS, stating "The Public Defender Service is correct that DOC is not following the 'Guidance on Management of COVID-19 at Correctional and Detention Facilities', issued and updated regularly by the Center for Disease Control." *See id.* ECF No. 23-2 at 11. The "City does not have the resources to combat COVID-19, and the Jail is the lowest priority among the health and safety community" and "the City wants to keep the truth from the public." *Id.*

Notably, the declarations that are attached to the FOP/DOC amicus brief—provided primarily by the DOC's very own correctional officers with direct knowledge of the inner workings of the jails—illustrate that the DOC is not following its precautionary measures:

- DOC Corporal Benjamin Olubasusi "has witnessed that social distancing is not be[ing] followed by the inmates in the quarantine unit, who are individuals identified as having had contact with an inmate who tested positive for COVID-19. As of March 31, 2020, there were approximately 50 inmates on one unit and approximately 40 on the other. In each of these unites, the inmates were required to go on recreation together in close proximity. *See id.*, ECF No. 23-3, ¶ 17.

- DOC Sergeant Jannease Johnson: "Front line Correctional Officers have reported to Sgt. Johnson completely unsanitary conditions, complete lack of ventilation, and that they have to fight with management to get Personal Protective Equipment." *Id.* ¶ 31.

- DOC Corporal Lawanda Reddick: "The City is not being truthful on how inmates coming into the facilities are processed. Inmates are having their temperatures taken only. No other procedures are in place to screen incoming inmates." *Id.* ¶ 38.

- J. Michael Hannon, counsel for the Fraternal Order of Police and Department of Corrections: "As of [April 2, 2020], the DOC continues to operate in many respects as business as usual. Very few changes to the daily operations have been implemented in preparation for and in response to COVID-19." *Id.* ¶ 45. For example, there are "[n]o actual changes in protocols for cleaning of individuals in physical locations, or distribution of cleaning, sanitizing or disinfecting products, *id.* ¶ 46; "[n]o actual changes in protocols for . . . handling of inmate food preparation or distribution of food, *id.* ¶ 47; inmates "are allowed in-house recreation each day, and it occurs in groups, not individually. There is no social distancing encouraged, *id.* ¶ 65; and ***"[t]here is no true quarantine. Cell mates of inmates who have tested positive for COVID-19 remain in General Population,"*** *id.* ¶ 48, ***and "at least one of the inmates whose tests are pending is in general population."*** *Id.* ¶ 56.

Moreover, due to the DOC's inability to protect the inmates and staff, the FOP/DOC announced that it has unilaterally implemented its own procedures inside the jail, which openly declares that they will no longer protect those in their custody:

> Because COVID-19 testing in the Jail is only being used as a diagnostic tool, the rate of infection does not reflect the true level of infection at the Jail.  The spread of all illnesses in a Jail population dramatically exceeds that in the general population.  D.C.'s own statistics for newly infected persons show that almost a third of the 342 infected persons are in their 20's and 30's.  Any expert in public health will tell you that there are untested COVID-19 infected residents and infected corrections officers in the Jail today.
>
> Yesterday, FOP/DOC unilaterally implemented its own Protocol for corrections officers and other members working at the Jail.  In essence, because of the lack of PPE and other prophylactic cleaning measures, corrections officers will "shelter in place" in self-contained structures in the Jail called "bubbles."  Corrections officers will not leave the bubble for contact work with residents unless provided with the appropriate PPE.  This includes conducting security checks while residents are on the floor and delivering meals to cells.

Ex. G, FOP/DOC Press Release (March 29, 2020).

The announcement to "shelter in place" is a public declaration that correctional officers are abdicating their responsibilities to provide security or to even deliver meals to residents.  The officers in the DOC—entrusted with actually keeping individuals safe—are openly and publicly declaring that they are now "unwilling" to protect the individuals in their custody.

Thus, the reality of what is actually happening at the DOC stands in stark contrast to the blithe assurances found in the government's prior pleadings.  The DOC is in a state of chaos and is completely unable to protect those in its custody.  At this moment, there can be no doubt: "[r]eleasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." Ex. C, Beyrer Dec. ¶ 19.

## III. DISCUSSION

Mr. Leake's continued detention during the COVID-19 pandemic violates the mandates of the Bail Reform Act, the Fifth Amendment's Due Process Clause, and the Eighth Amendment's prohibition on cruel and unusual punishment.

### A. The Bail Reform Act empowers the Court to release Mr. Leake for COVID-19-related reasons.

### i. § 3142(f) empowers this court to release Mr. Leake on home confinement.

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Earlier on in this case, on June 8, 2019, Mr. Leake conceded his detention. *See*, Detention Order, ECF No. 14. Magistrate Judge Merriweather then issued a written decision finding that all the factors weigh in favor of detention because Mr. Leake is charged with gun and drug offenses that trigger a rebuttable presumption; he was on supervised release at the time of the alleged offense; he had previously been convicted of a firearm offense; and, given that he conceded his detention, he presented no evidence to mitigate these facts. *Id.*

Since that time, circumstances have radically changed. The Bail Reform Act provides that the detention hearing "may be reopened" at any time if new information surfaces that has a "material bearing on the issue [of] whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The pandemic is new information that has a material bearing on pretrial release and affects the Court's analysis of the third and fourth factors under 18 U.S.C. § 3142(g). *See United States v. McLean,* No. 19-cr-380-RDM, ECF No. 21 (D.D.C. Mar. 28, 2020); Order, *United States v. Gardner*, 19-cr-336-AMP, ECF 84 (D.D.C. April 2, 2020).

     **1.   The third factor now favors release.**

Section 3142(g)(3) requires this Court to consider the "history and characteristics of the person," including their physical and mental condition.  Mr. Leake is a lifelong DC resident, active father of two children, and has substantial ties to the community and their school.

He also faces tremendous health risks at this time.  The World Health Organization reports that "[i]ndividuals at highest risk for severe disease and death include people . . . with underlying conditions such as hypertension, diabetes, cardiovascular disease, *chronic respiratory disease* and cancer."[29]  Mr. Leake suffers from chronic respiratory disease (asthma), placing him in the "highest risk" category for contracting a life-threatening form of COVID-19 and being unable to survive it.  Worse yet, he was housed in the same unit as a person who tested positive for COVID-19 (Raymond Avanti), and despite having flu-like symptoms, he has not been tested or quarantined.  Given his underlying medical conditions and experience thus far at the DC Jail, if he were released on home confinement, the fear of having to return to the dangerous jail environment, where he would be placed at great risk of contracting and potentially dying from COVID-19, serves as a strong incentive to abide by all release conditions.

In analogous circumstances, involving vulnerable defendants charged with drug and gun offenses, courts have ordered their release in light of COVID-19 related concerns.  *See, e.g.*, *United States v. McLean,* No. 19-cr-380-RDM, ECF No. 21 (D.D.C. Mar. 28, 2020); Order, *United States v. Gardner*, 19-cr-336-AMP, ECF 84 (D.D.C. April 2, 2020); Min. Order, *United*

---

[29] *See Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization, at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (emphasis added).

States v. Jaffee, No. 1:19-cr-88-RDM (D.D.C. Mar. 26, 2020); *United States v. Davis*, No. 19-cr-292-JDB, ECF No. 157 (D.D.C. April 6, 2020).

In *McLean*, for example, Judge Moss released a defendant charged with gun and drug offenses, who had a "lengthy" criminal history and a "pattern of disregard for court-ordered conditions of his release."  *United States v. McLean,* No. 19-cr-380-RDM, ECF No. 21 (D.D.C. Mar. 28, 2020).  Regarding the third factor, Judge Moss reasoned.

> Defendant has asked that the Court release him on home confinement under the High Intensity Supervision Program ("HISP"). By violating the terms of that condition, Defendant would face two distinct risks—the risk that he would be sent back to the D.C. jail, where he might be unable to distance himself from others in the manner urged by the CDC, and the risk that he would come into contact with someone while outside his home, who could infect him. At a time at which much of the population of the District of Columbia is remaining at home to avoid contracting or spreading the disease, those at high risk—like Defendant—have compelling reason to stay at home.

The same reasoning applies here.

### 2.  The fourth factor now favors release.

The fourth factor found in § 3142(g)(4) also supports his release in light of the global COVID-19 pandemic.  The relevant part of § 3142(g)(4) provides that "the judicial officer shall, in determining whether there are conditions of release that will reasonably assure . . . the safety of any other person and the community, take into account the available information concerning . . . the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

This Court recently found that "the relevant statutory inquiry is not the benefits that a defendant's release would bring about (however significant) or the harms that his incarceration would cause (however substantial).  Rather, the statute requires the Court to evaluate 'the

danger' that 'would be posed by the person's release.'" *Lee*, 2020 WL 1541049, at *5.  Because of this, the Court rejected the argument that the defendant's "'release enhances the safety of other people in the community' because 'it is the incarceration that is dangerous during the COVID-19 pandemic.'" *Id.*

To the extent that the Court believes the global COVID-19 pandemic is entirely irrelevant to the fourth factor, Mr. Leake respectfully disagrees.  Such a view would miss the forest (the overall purpose of the BRA) for the trees (a few isolated words in the text of § 3142(g)(4)).  That is, the entire purpose of § 3142 as a whole, and § 3142(g)(4) in particular, is to protect a defendant's liberty interests while simultaneously ensuring that the community is protected.  It makes little sense to require a defendant to remain incarcerated where, on balance, he poses a greater risk to the community when incarcerated than when released, especially given that pretrial detention is meant to be used only as a means of last resort.  *See Salerno*, 481 U.S. at 755 ("In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").  In other words, if taken to its logical conclusion, such a view would do the opposite of what the BRA intends: it would *not* protect a defendant's liberty interest and it would *not* protect the community's safety.  That cannot be the rule.

Moreover, the statute's requirement to evaluate the danger that would be posed to the community by the person's release *supports* the view that the COVID-19 pandemic is relevant to the fourth factor.  This is so because the pandemic makes it possible to actually *decrease* the danger that a defendant poses to the community by releasing him into the community.  In other words, before the pandemic, the assumption was that incarceration virtually always protects the community.  But during this unprecedented moment in our history, that assumption has been

flipped on its head.  Now, the scientific community has spoken in one voice: we need to

decarcerate to protect the safety of the community:

- Dr. Beyrer from Johns Hopkins University: "Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." Ex. C, Beyrer Dec. ¶ 19.

- Dr. Greifinger: "Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention[.]" Ex. D, Greifinger Dec. ¶ 13.

- Dr. Stern: "Downsizing jail populations by releasing high risk individuals and others the court system deems eligible for release will help to "flatten the curve" overall—both within the jail setting and without." Ex. A, Stern Dec. ¶ 11.

- Dr. Meyer, an Assistant Professor of Medicine at Yale School of Medicine: "Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large." Ex. F, Meyer Dec. ¶ 37.

Courts, recognizing that incarceration now poses a threat to the safety of the community,

have understood that the fourth factor necessarily requires the court to weigh the danger the

defendant poses to the community against the benefits his release would impose during the

pandemic.

In *McLean*, for example, Judge Moss ordered a defendant charged with gun and drug

offenses because "Defendant's continued pretrial detention poses a risk to the community

safety" that is greater than the "risk posed by his release to home confinement under HISP.");

*see also* Min. Order, *United States v. Jaffee*, No. 1:19-cr-88 (D.D.C. Mar. 26, 2020) (releasing

defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and

"real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that

incarcerating the defendant while the current COVID-19 crisis continues to expand poses a

greater risk to community safety than posed by Defendant's release to home confinement").

Similarly, in *Gardner*, Judge Mehta found that the fourth factor favored release because "Defendant's continued presence at CTF presents a risk not only to himself, but to other inmates and the institution's staff.  And, although there is some risk that he might continue to engage in drug trafficking activities on release, the court believes that risk is mitigated in the present health crisis under conditions of release." *See, e.g.*, Order, *United States v. Gardner*, 19-cr-336-APM, ECF No. 84 (D.D.C. April 2, 2020);

Just yesterday, Judge Bates released a defendant charged with trafficking over 280 grams of crack cocaine and discussed at length how his vulnerability to COVID-19 is a threat "not just to Davis," but to the community at large.  *See United States v. Davis*, No. 19-cr-292-JDB, ECF No. 157 at 5-6 (D.D.C. April 6, 2020).

Numerous other courts have adjusted their analysis of the fourth factor in this manner as well.  *See, e.g.*, *United States v. Davis*, No. 20-cr-09, ECF No. 21, at 6 (D. Md. Mar. 30, 2020) ("The Court finds that the COVID-19 public health emergency must be considered when weighing 'the nature and seriousness of the danger to any person or the community that would be posed by the person's release' and the defendant's 'physical and mental health.' 18 U.S.C. § 3142(g)(3)(A) & (4)."); *United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("Although there is not yet a known outbreak [of COVID-19] among the jail and prison populations, inmates may be at a heightened risk of contracting COVID19 should an outbreak develop . . . A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis."). This Court should do the same.

The current pandemic particularly changes the fourth factor's calculus for Mr. Leake. He is at the "highest risk for severe disease and death" because of his asthma.  As recognized by Judges Bates and Moss, "the threat is not just to [the defendant]," as "'[t]he risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real.'"  *See, e.g.*, *United States v. Davis*, No. 19-cr-292-JDB, ECF No. 157 at 5 (D.D.C. April 6, 2020) (quoting *Harris*, 2020 WL 1482342, at *1).  If Mr. Leake contracts the virus, "he will likely require significant medical resources and attention, and even if he does not contract the virus, he is at a minimum another inmate requiring medical treatment for respiratory problems at the D.C. Jail."  *Id.*  And if "the virus continues to spread, decreasing the number of people in the D.C. Jail and lessening the burden on the jail's limited healthcare resources will be crucial to protecting all inmates and staff at the D.C. Jail as well as people in the surrounding community."  *Id.*; *see also See Joint Statement from Elected Prosecutors on COVID-19 and Addressing the Rights and Needs of those in Custody*, Fair and Just Prosecution (updated Mar. 25, 2020) ("If these facilities become breeding grounds for the coronavirus, it will not only impact those incarcerated, but our entire community.").

Importantly, there are conditions of release that can ensure that Mr. Leake does not pose a danger to the community: he can be placed into 24-hour home confinement at his child's mother's residence in Camp Springs, Maryland.  Maryland is currently under a stay-at-home order, punishable by arrest and a prison term of up to one year.  In other words, Mr. Leake will not only be required to stay at home through supervision in this case, but also pursuant to the State's order.

The Court should not view the question of whether Mr. Leake presents a danger to the community in a vacuum.  Mr. Leake would be released into a changed world where the vast majority of individuals in the DMV area are under orders to stay home.  Nationwide, crime rates have plummeted in large cities since the pandemic began.[30]  We are now in a situation where incarceration poses a grave public threat.  Here, where Mr. Leake does not pose a meaningful risk to public safety, and where his continued detention does, the fourth factor strongly favors his immediate release.

### ii. Alternatively, §3142(i) empowers this Court to temporarily release Mr. Leake on home confinement.

This Court also has authority to order Mr. Leake's temporary release into home confinement under 18 U.S.C. §3142(i).  This section provides that a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  *Id.*  Mr. Leake's release is both necessary for the preparation of his defense and for another compelling reason (COVID-19).

As discussed above, COVID-19 poses an extreme risk to Mr. Leake because his asthma makes him "highest risk for severe disease and death."  Therefore, Mr. Leake's particular

---

[30] *See, e.g.*, Shayna Jacobs & Devlin Barrett, *New York City's crime rate plummets amid coronavirus shutdown*, Washington Post (Mar. 26, 2020), https://www.washingtonpost.com/world/national-security/coronavirus-new-york-city-crime/2020/03/26/6a408e94-6f9a-11ea-a3ec-70d7479d83f0_story.html; *see also* Jeremy Gorner, *Chicago joins New York, Los Angeles with drops in crime as coronavirus and shelter order take hold*, Chi. Tribune (Mar. 27, 2020), https://www.chicagotribune.com/news/criminal-justice/ct-coronavirus-chicago-police-crime-impact-20200327-yfkunl2ztbcjdbjz2r6u3yjcdm-story.html.

vulnerability to COVID-19 and the DOC's failures to properly address his medical needs constitutes "another compelling reason" under §3142(i).  *See, e.g.*, *United States v. Davis*, No. 19-cr-292-JDB, ECF No. 157 at 7 (D.D.C. April 6, 2020) (granting temporary release to a defendant charged with trafficking over 280 grams of crack cocaine because his "acute bronchitis puts him at risk of serious illness from COVID-19"); *United States v. Michaels*, No. 16-cr-76, 2020 WL 1482553 (C.D. Cal. Mar. 26, 2020) ("[T]he Covid-19 virus and its effects in California constitute "another compelling reason."); *United States v. Tovar*, No. 1:19-cr-341, ECF No. 42 (D. Idaho Apr. 2, 2020) (releasing defendant previously detained in presumption case after finding COVID-19 a compelling basis for release under § 3142(i)).

In addition, Mr. Leake's release is necessary for the preparation of his defense.  Now that there are 20 confirmed cases inside of the DOC, it is no longer safe to have in-person legal visits.  As a consequence, Mr. Leake has has been denied meaningful opportunities to communicate with his counsel, review discovery, or otherwise participate in his defense. The DOC has stated that it will allow attorneys to have legal calls for 15 minutes.  Having these calls, however, has been incredibly difficult if not impossible.  Defense counsel has been unable to have legal calls with Mr. Leake (among other clients).  Other attorneys from the Federal Public Defender's Office have faced similar difficulties.  When counsel is ultimately able to speak with Mr. Leake, it is already clear that a 15 minute phone call is insufficient to talk strategy, provide updates, and make decisions that will shape the rest of Mr. Leake's life.   Moreover, without the ability to frequently communicate with Mr. Leake, counsel is unable to obtain updates on his health and safety during this chaotic time.  And counsel is unable to exert meaningful accountability with regard to the jail officials' vague assertions that they continue to break.

The District Court for the District for Maryland—which houses many of its inmates at DOC facilities—has specifically weighed in on DOC's restrictions on the attorney-client privilege:

> Because of COVID-19 concerns, CDF has eliminated contact meetings with counsel. Instead, counsel may meet with their clients in visitation booths traditionally used for non-contact family visits. In these booths, the defendant and his attorney are separated by plexiglass and must use a phone to communicate. CTF has not eliminated contact visits with counsel; attorneys are still permitted to meet with their clients in the attorney-client meeting rooms.
>
> Both arrangements pose myriad challenges for the lawyer, the defendant, and the attorney-client relationship. As a general matter, attorneys may not want to enter any of the detention facilities out of fear for their and their family's health. They also may not want to risk unwittingly carrying the virus into the facilities and transmitting it to their clients, other detainees, or jail employees. Attorneys will be even more deterred from visiting a client now that five detainees at CTF have tested positive for COVID-19. For those attorneys who do venture into the facilities during this public health crisis, they do so at their own risk.
>
> If an attorney does not visit his client at the jail, his only means of communication is by telephone and U.S. mail. The various technological alternatives to in-person meetings that many of us have taken advantage of during this crisis—FaceTime and Zoom, for example—are unavailable to incarcerated people. Even if these means of communication were an available option, there is no substitute for a face-to-face, in-person, contact meeting between an attorney and his client.

*United States v. Davis*, No. 1:20-cr-09-ELH, ECF No. 21 (D. Md. Mar. 30, 2020) (releasing Mr. Davis with conditions based in part on Sixth Amendment implications).

The District Court for the District of Maryland is in good company. As the District Court for the Southern District of New York recently remarked, "The hazards of a pandemic are immediate and dire, and still the rights of criminal defendants who are subject to the weight of federal power are always a special concern of the judiciary." *United States v. Chandler*, No. 1:19-cr-867, ECF No. 19 at 3-4 (Mar. 31, 2020) (releasing defendant under § 3142(i)); *United States v. Stephens*, 2020 WL 1295155, at * 3 (S.D.N.Y. Mar. 19, 2020) (finding "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a

compelling reason under 18 U.S.C. § 3142(i)"). Accordingly, the pandemic, coupled with the DOC's failure to facilitate legal calls, necessitates his release to prepare for his defense.

Lastly, "case law suggests that family members may constitute 'appropriate persons' where the defendant is released to relatives and placed under house arrest." *Id.* Mr. Leake is requesting that he be released to his child's mother's residence in Maryland and placed under house arrest during the pandemic.

### B. The Fifth Amendment Due Process Clause empowers the Court to release Mr. Leake for COVID-19-related reasons.

The Fifth Amendment Due Process Clause compels the Court to protect Mr. Leake from punitive conditions of confinement and ensure that he is afforded adequate medical care. A pretrial detainee's freedom from pretrial confinement is a fundamental right protected by the Due Process Clause; any government action infringing on this right must be narrowly tailored to achieve a compelling government interest. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

The constitutional protections of pretrial detainees arise under the Fifth Amendment Due Process Clause, which provides protection even greater than the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Eighth Amendment, which applies to persons convicted of criminal offenses, allows punishment as long as it is not cruel and unusual, but the Fifth Amendment's due process protections do not allow pretrial punishment at all. *Id.* Although the Government has an interest in detaining a defendant to secure their appearance at trial, Government may only subject a detainee "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37. In *Kingsley v. Hendrickson*, the Supreme Court affirmed the Due Process Clause's prohibition on pretrial punishment, and elaborated that "if the

condition of confinement being challenged 'is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment.'"  135 S. Ct. 2466, 2470 (2015); *see also Doe v. Kelly,* 878 F.3d 710 (9th Cir. 2017) ("a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective").

In addition, pretrial detainees have a substantive due process interest in freedom from deliberate indifference to their medical needs.  *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).  Furthermore, in *Brown v. Plata*, the Supreme Court explained that a prisoner "may suffer or die if not provided adequate medical care.  A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."  563 U.S. 493, 510–11 (2011).  While prisoner claims in *Brown v. Plata* arose under the Eighth Amendment, pretrial detainees likewise have the legal right to adequate medical care, given that their rights are at least as great as those of convicted persons being punished by imprisonment.

Mr. Leake has not yet received a sentence or final judgement in his case, and is entitled to the protections that must be afforded to pretrial detainees.  The current conditions of confinement create an unreasonable risk of exposure to COVID-19 and do not provide the necessary supplies for personal and environmental hygiene necessary to protect against contraction of the virus.  Accordingly, in light of the extreme risk to Mr. Leake's health posed by the virus and the ever-increasing likelihood that he will contract it if he remains housed under current conditions, the conditions of his confinement are punitive, in violation of the Fifth

Amendment.

This Court rejected a similar claim in *Lee* because, "given the aggressive precautions that DOC appears to have undertaken to prevent the spread of COVID-19 within its facilities," the defendant would not be able to establish the DOC's deliberate indifference to this threat. *Lee*, 2020 WL 1541049, at *5.  However, as discussed above, many of the "precautions that DOC appear[ed] to have undertaken" were actually *not* implemented, followed, or enforced—they existed in name only.  *See supra*, section II.D.  The numerous declarations—by DOC residents, DOC staff, attorneys, and experts—that have been filed in the class action lawsuit against the DOC shows that it has acted with deliberate indifference to this crisis.  Mr. Leake is high risk, was housed in the same unit as a person who tested positive for COVID-19, and, despite having flu-like symptoms, has not been tested or quarantined.  Release pending sentencing is appropriate to ensure his constitutional rights are protected and is life is not further jeopardized during this crisis.

### C.  The Eighth Amendment empowers the Court to release Mr. Leake for COVID-19 related reasons.

The Eighth Amendment prohibition against cruel and unusual punishment also compels release under the current extraordinary circumstances.  The government, in detaining defendants pretrial, must take sufficient protective measures to prevent contraction of COVID-19 in the jail population.  Unreasonable risk of COVID-19 contraction will, in itself, constitute an Eighth Amendment violation.

The Supreme Court has held that exposure to environmental threats to an incarcerated person's physical wellbeing where exposure is preventable could constitute a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  *See Helling v.*

*McKinney*, 509 U.S. 25, 28 (1993).  In *Helling,* a plaintiff alleged that he was assigned to a cell with another inmate who smoked five packs of cigarettes per day.  *See id.* at 28.  At issue was whether this exposure to environmental tobacco smoke (ETS) could constitute a valid claim under the Eighth Amendment, even though the plaintiff had not yet suffered harm.  *Id.* at 30. The Supreme Court upheld the decision of the Court of Appeals, finding that the plaintiff stated "a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health."  *Id.* at 35.  "Though *Helling* directly addressed an inmate's exposure to [secondhand smoke], it tacitly acknowledged other situations in which environmental factors can pose an unreasonable risk to an inmate's health, including exposure to 'infectious maladies such as hepatitis and venereal disease' caused by overcrowding, unsafe drinking water, and 'toxic or other substances."  *Allen v. Kramer*, 2016 WL 4613360, at *7 (E.D. Cal. Aug. 17, 2016) (quoting *Helling*, 509 U.S. at 33, 35.)

The Ninth Circuit has applied *Helling* to exposure to asbestos finding it was "uncontroverted that asbestos poses a serious risk to human health" and the plaintiff "proffered specific evidence showing that the defendants knew of the existence of and dangers posed by asbestos."  *Wallis v. Baldwin* 70 F.3d 1074 (9th Cir. 1995).  *Helling* has also been applied to "contagious diseases caused by overcrowding conditions, *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004); contaminated water, *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001); compelled use of chemical toilets, *Masonoff v. DuBois*, 899 F. Supp. 782, 797 (D. Mass. Sep. 11, 1995), [and] paint toxins, *Crawford v. Coughlin*, 43 F. Supp. 2d 319, 325 (W.D.N.Y. 1999)."  *Allen*, 2016 WL 4613360, at *8.

Perhaps most applicable to COVID-19, a number of cases have applied *Helling* to the exposure of inmates to Valley Fever in California.  Relying on *Helling*, *Allen v. Kramer* concluded that an inmate plaintiff had alleged an Eighth Amendment violation because he was housed in the Central Valley where there was a relatively high risk of contracting Valley Fever. *See Allen*, 2016 WL 4613360, at *1, 11.  *Shabazz* adopted *Allen*'s reasoning and came to the same conclusion. *Shabazz v. Beard*, 2018 WL 1071173, at *7-9 (E.D. Cal. Feb. 27, 2018); *see also Jackson v. California,* 2014 U.S. Dist. LEXIS 22966, at *32-38 (E.D. Cal. Feb. 20, 2014) (overruled on other grounds in *Hines v. Youseff*, 914 F.3d 1218, 1231 (9th Cir. 2019) (explicitly declining to reach Eighth Amendment question but reversing on fact-specific finding of qualified immunity)).

The reasoning of *Allen v. Kramer*, *Shabazz v. Beard*, and *Jackson v. California*, and other cases applying *Helling* to exposure to environmental risks applies with equal or greater force to COVID-19, and establishes that officials who fail to adequately protect inmates from the risk of contracting COVID-19 violate the Eighth Amendment.  Where protections from COVID-19 for incarcerated clients are insufficient, as in this case, whether for the jail population as a whole or for particularly at-risk individuals, release is constitutionally mandated.

Mr. Leake is housed at a facility that is unable to adequately protect him from contracting the virus, and more importantly, places him at a heightened risk of exposure due to the environmental conditions.  His continued detention under these conditions violates the Eighth Amendment, and necessitates his immediate release pending containment of the virus.

## IV. CONCLUSION

Mr. Leake respectfully asks for release on strict conditions, including ankle monitoring and home detention. This is the only way to promote public health, protect Mr. Leake, and ensure that his constitutional rights are respected during this emergency.

Respectfully submitted,

A. J. KRAMER
Federal Public Defender

_____/s/_____
MICHELLE PETERSON
Chief Assistant Federal Public Defender

_____/s/_____
BENJAMIN FLICK
Research & Writing Attorney
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004
(202) 208-7500