**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT LEAKE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Criminal No. 19-cr-194 (KBJ)

**<u>MEMORANDUM OPINION</u>**

On June 6, 2019, a federal grand jury indicted Defendant Robert Leake of four

offenses related to his alleged unlawful possession of illegal controlled substances and

a firearm on May 28, 2019, while Leake was in the laundry room of the apartment

complex where he was residing.  (*See* Indictment, ECF No. 1.)[1]  Before this Court at

present is Leake's motion to suppress the tangible evidence that was recovered incident

to his arrest for those offenses.  (*See* Def.'s Mot. to Suppress ("Def.'s Mot."), ECF No.

18.)  Leake argues that he was subjected to an unlawful seizure in violation of the

Fourth Amendment when two District of Columbia Metropolitan Police Department

("MPD") officers entered the laundry room without a warrant and arrested him,

allegedly without sufficient cause.  (*See* Def.'s Mot. at 1 ("The officers did not have a

warrant or probable cause to search or arrest Mr. Leake, or reasonable suspicion to stop

and frisk him when they arrested him."); *see also* Def.'s Reply in Supp. of Mot. ("Def's

_____

[1] The four charges in Leake's indictment are:  (1) unlawful possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g); (2) unlawful possession with intent to distribute twenty-eight grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); (3) unlawful possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (4) using, carrying, and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1).

Reply"), ECF No. 21, 1–6.)[2]  Leake also argues that his Fourth Amendment rights were violated when the officers used force to execute the arrest.  (*See* Def.'s Mot. at 1 ("Without observing any illegal activity, [the officers] approached [Leake] and forcibly threw him to the ground and searched him."); *see also* Def.'s Mot. at 3–4.)

This Court held an evidentiary hearing with respect to Leake's suppression motion on March 5, 2020, during which it heard testimony from two witnesses: Officer Wilmino Pantaleon (one of the arresting officers) and a defense character witness, Ms. Kyia Branham.  (*See* Minute Entry of Mar. 5, 2020.)  The Court also received evidence, including videotaped footage of the events preceding, during, and after Leake's arrest. (*See* Gov't Exs. 1, 2; Def.'s Exs. V1, V2, V3; *see also* Gov't Ex. List, ECF No. 31; Def.'s Ex. List, ECF No. 32.)[3]  During a separate hearing held on May 5, 2020, counsel for the prosecution and the defense presented legal arguments to the Court concerning this evidence.  (*See* Minute Entry of May 5, 2020.)  As explained fully below, upon careful consideration of the evidence and arguments, this Court has made numerous findings concerning the facts related to events that preceded and encompassed Leake's

---

[2] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

[3] Six videotapes that depict the events surrounding Leake's arrest were received into evidence.  Two came from the body-worn cameras of the arresting officers (*see* Gov't Exs. 1A, 1B), and three others contained clips from body-worn camera footage of other members of the MPD who arrived on the scene after the arrest (*see* Def.'s Exs. V1, V2, V3).  The sixth video came from the surveillance camera in the laundry room that was the site of Leake's arrest.  (*See* Gov't Ex. 2 (offering three contiguous clips from the surveillance footage labeled as Exhibits 2A, 2B, and 2C).)  The video from the officers' body-worn cameras is cited to herein as "BWC" followed by the time stamp that appears on the video at the relevant moment.  The officers' body-worn cameras' timestamp corresponds to "Zulu time," which is four hours ahead of Eastern Standard Time during the daylight savings period.  (Mar. 5 Tr. 64:14–25.) Some of the video footage contains both visual depictions and sound, while others only contain visual depictions.  As a general matter, body worn cameras can be activated by the officer, and when so activated, the camera begins recording *both* video *and* audio.  (*See* Mar. 5 Tr. 61:19–22.)  Body worn cameras that are operating in standby mode continue to record video without sound, and upon activation, the previous two minutes of video footage, with no audio, is retained and can be retrieved along with the footage that is recorded from the moment of activation.  (*See* Mar. 5 Tr. 61:16–18.)

arrest, and it has also reached several conclusions of law related to Leake's Fourth Amendment arguments.

In short, and as explained below, the Court finds that Leake's stance in the corner of the laundry room was suspicious, and that upon approaching him, Officer Pantaleon observed Leake holding a small clear plastic baggie containing a powder-like substance. Officer Pantaleon reasonably believed that the baggie contained narcotics, and as Officer Pantaleon grabbed Leake to investigate this suspicious activity, Leake attempted to flee, which resulted in a prolonged physical struggle between the police officers and Leake. Leake was not arrested for Fourth Amendment purposes until the officers saw that he was carrying a gun on his person. And given these findings, the Court further concludes that the officers' actions were reasonable for Fourth Amendment purposes. Officer Pantaleon had a reasonable articulable suspicion that justified the initial investigatory stop of Leake, and he had probable cause to arrest Leake when the gun fell out of Leake's waistband. Moreover, Leake does not have Fourth Amendment standing to claim that the officers' presence in the building's laundry room constituted a constitutional violation from the outset, nor was the officers' use of force to detain and arrest Leake unreasonable given his active resistance (which was captured clearly on the officers' body-worn cameras and the laundry room video surveillance system). Therefore, Leake's Fourth Amendment rights were not violated when the officers arrested him on May 28, 2019, and, accordingly, Leake's motion to suppress the tangible evidence recovered at the time of his arrest must be **DENIED**. A separate Order consistent with this Memorandum Opinion will follow.

## I.    FINDINGS OF FACT

The events leading up to Leake's arrest occurred at Edgewood Commons, a residential community in the northeastern quadrant of the District of Columbia.  (*See* Mar. 5, 2020, Hr'g Tr. ("Mar. 5 Tr."), ECF No. 30, 7:23–24.)[4]  Edgewood Commons consists of multiple apartment buildings of various sizes; the entire complex takes up several city blocks.  (*See* Mar. 5 Tr. 8:1–8.)  Leake resides in a building in the Edgewood Commons complex located at 525 Edgewood St. NE (hereinafter, the "525 Building") (*see* Mar. 5 Tr. 9:17), which is separated by a common plaza area from 601 Edgewood St. NE (hereinafter, the "601 Building"), a large apartment building in the same complex (*see* Mar. 5 Tr.  8:10–12; 13:24–14:5).  There are approximately 200 units in the 601 Building.  (*See* Mar. 5 Tr. 55:16–17.)  The 601 Building also houses after-school programs for children in the community.  (*See* Mar. 5 Tr. 10:5–10.)  The program for younger students takes place in the basement of the 601 Building, and the program for older students occurs in a space adjacent to the 601 Building.  (*Id.*)

Notably, a resident of any of the buildings in the Edgewood Commons complex has a key card that accesses only his own building—that is, the key card for one building does not work on any other building in the complex.  (*See* Mar. 5 Tr. 37:20–25.)  However, the doors of the 601 Building are often propped open, because there is "heavy traffic at Edgewood[.]"  (Mar. 5 Tr. 27:1–7.)  In particular, "most residents" enter through the side door of the 601 Building due to its proximity to the adjacent

---

[4] The Court finds, as a general matter, that Ms. Kyia Branham presented relevant facts of which she had first-hand knowledge in a frank and candid manner and that her testimony was generally credible. Thus, the Court has accepted her testimony as its findings of fact concerning the Edgewood Commons property, unless otherwise noted.

parking lot and the fact that the side door is "the most practical entrance to get into the building[.]"  (Mar. 5 Tr. 12:13–14; *see also* Mar. 5 Tr. 18:22–19:1.)  Thus, although the side door of the 601 Building is intended to be locked and only accessible to building management (*see* Mar. 5 Tr. 41:21–42:3), that door is frequently held open, or otherwise propped open, for use by Edgewood Commons residents (*see* Mar. 5 Tr. 30:15–22).

The laundry room in the 601 Building is large, and has a significant number of laundry machines, in order to accommodate the number of residents in the 601 Building.  (*See* Mar. 5 Tr. 16:3–10.)  It is also easily accessible through the side door of the 601 Building and is located in the basement of the building, across the hallway from the after-school program for younger children.  (*See* Mar. 5 Tr. 28:6–10; 28:22–30:9.)

Officer Pantaleon had been an officer with the MPD for more than five years at the time of his testimony concerning Leake's arrest.  (Mar. 5 Tr. 46:20–22.)[5]  In the spring of 2019, Officer Pantaleon regularly patrolled at Edgewood Commons, due to the high crime nature of the neighborhood (*see* Mar. 5 Tr. 89:23–90:2), and he visited the 601 Building, in particular, "once or twice a week," entering the building through the side door.  (Mar. 5 Tr. 57:23–58:4.)  The MPD officers generally have a good relationship with the Edgewood Commons security officers, who have asked MPD

---

[5] During the motions hearing, Officer Pantaleon testified to relevant facts of which he had first-hand knowledge, and he did so in a candid manner.  Officer Pantaleon is familiar with the Edgewood Commons complex; he has training and experience with respect to narcotics investigations; and he recalled the specific events related to Leake's arrest.  Moreover, Officer Pantaleon's body worn camera footage largely corroborates his testimony, and any discrepancies are not material to legal issues that Leake's motion raises.  Therefore, this Court finds that Officer Pantaleon's testimony was credible, and unless otherwise noted, the Court has accepted his testimony regarding the circumstances of the challenged seizure and arrest.

officers to "stop by" the property regularly while they are on patrol.  (*See* Mar. 5 Tr. 64:1–7, 91:8–13, 99:11–13.)

Officers Pantaleon and Aaron Follman were on patrol in the Edgewood neighborhood, at approximately 6:43 PM, on May 28, 2019.  (*See* Mar. 5 Tr. 65:3–66:5.)  These officers' sergeants had directed them to patrol in that neighborhood on that day.  (Mar. 5 Tr. 47:12–19, 51:23–25.)  Officers Pantaleon and Follman entered the 601 Building through the side door, which was unlocked, and because the side door lacked a handle, Officer Pantaleon used his fingertips to pry the door open.  (Mar. 5 Tr. 57:11–15; Pantaleon BWC, Gov't Ex. 1A, at 22:44:10–12.)[6]  The unlocked side door opened into a stairwell, and Officer Pantaleon walked up one short flight of steps and then entered a long hallway through the first door that he came to off of the stairwell. (Pantaleon BWC at 22:44:13–27.)  While Officer Follman remained behind in the hallway (*see* Mar. 5 Tr. 71:15–17), Officer Pantaleon decided to "check the laundry room" because "usually people are in there doing stuff" (Mar. 5 Tr. 58:11–13).  Officer Pantaleon walked down the hallway until he reached the open door of the building's laundry room (on the right side) through which he then entered.  (*See* Pantaleon BWC at 22:44:27–49.)

Upon walking into the open door of the laundry room, Officer Pantaleon immediately spotted a man standing in the corner of the room, with his back to Officer

---

[6] Officer Pantaleon testified that the officers had entered the 601 Building on that particular occasion because they saw a man "playing with a snake" who was walking as though he "might have a gun on him . . . who went into the side [door] of 601."  (Mar. 5 Tr. 53:8–14.)  The body-worn camera footage of the officers' entry does not confirm this account, as no such man appears on the video, either when the officers alighted from their parked patrol car and began walking into the building after Officer Pantaleon pried the door open.  Nevertheless, the Court need not make a factual finding with respect to the officers' purported reason for entering the building because, for the reasons explained in Part II.A, *infra*, Leake does not have standing to challenge the lawfulness of the officers' entrance into the 601 Building.

Pantaleon and his face close to the wall.  (*See* Mar. 5 Tr. 58:18–21; Pantaleon BWC at 22:44:55–45:01.)  The man—who was later identified as Leake—was standing between two vending machines that were perpendicular to one another and was looking down at his hands.  (*See* Mar. 5 Tr. 58:18–21; Pantaleon BWC at 22:44:55–45:01.)  Officer Pantaleon testified that he thought "it was odd" to find a person standing in that fashion, so he began walking through the laundry room toward Leake.  (Mar. 5 Tr. 60:10–13.)  As he approached Leake from behind, Officer Pantaleon saw that Leake was "playing with something" in his hands, so he said to Leake: "Hey, buddy. What you got there?"  (Mar. 5 Tr. 68:9–16.)[7]

Leake quickly turned his body away from the wall to glance briefly in Officer Pantaleon's direction, at which point Officer Pantaleon saw a clear plastic baggie in Leake's hand.  (*See* Mar. 5 Tr. 60:13–14; Pantaleon BWC at 22:45:08–10.)  The baggie contained a light-colored powder-like substance.  (*See* Mar. 5 Tr. 60:13–15, 69:7–8.)[8] And after seeing the baggie in Leake's hand, Officer Pantaleon approached Leake and grabbed Leake's left arm.  (*See* Mar. 5 Tr. 69:15–18; Pantaleon BWC at 22:45:13–14.) When Officer Pantaleon cornered him and made physical contact in this way, Leake

---

[7] There is no audio in the body-worn camera footage at this point, *see supra* note 3, but on the video, it is apparent that Officer Pantaleon catches Leake's attention somehow, because Leake turns quickly to face out into the room and away from the wall, and he looks directly at Officer Pantaleon.  (Pantaleon BWC at 22:45:09–10.)

[8] During his post-arrest statements, Officer Pantaleon described the substance that he saw in the baggie in Leake's hands in various ways: as "heroin" (Pantaleon BWC at 22:53:28), a "white" substance (Radon BWC, Def.'s Ex. V3, at 22:59:58), and a "light-brown powder like substance" (Final Investigation Report, Def.'s Ex. 8).  The Court finds that these discrepancies concerning the color of the substance (*see* May 5 Tr. 28:21–29:8) are immaterial, however, because Officer Pantaleon consistently related that he observed a plastic baggie containing a substance that caused him, in that moment, to form an opinion that the baggie contained narcotics, based on his training and experience (*see* Mar. 5 Tr. 60:16–19, 69:9–13).  The body-worn camera footage, too, captures Leake at the moment of confrontation, and he appears to have an object in his hand consistent with a small, clear plastic baggie.  Thus, the video corroborates Officer Pantaleon's testimony.  (*See* Pantaleon BWC at 22:45:09–10.)

attempted to "run through" Officer Pantaleon to flee, and a struggle ensued. (Mar. 5 Tr. at 69:20–70:5). Officer Pantaleon held his grip on Leake's arm, but Leake managed to push his way out of the corner between the vending machines and tried to pull away from Officer Pantaleon in order to exit the laundry room through the open door. (*See* Pantaleon BWC at 22:45:15–22; Laundry Room Surveillance Camera Footage ("Surveillance Cam."), Gov't Ex. 2A, at 18:45:17–23.)[9] As Officer Pantaleon struggled to restrain Leake, he called out for Officer Follman, and Officer Follman responded to the laundry room shortly thereafter. (*See* Mar. 5 Tr. 71:8–14; Surveillance Cam. at 18:45:23.)

Both officers then tried to subdue Leake by pushing him down to the floor, and during this struggle, a firearm fell from Leake's person onto the ground near the open doorway of the laundry room. (*See* Mar. 5 Tr. 74:2–7; Surveillance Cam. at 18:46:11.)[10] Officer Follman then pushed the firearm away from the doorway and in front of one of the vending machines. (*See* Mar. 5 Tr. 74:19–20; Pantaleon BWC at 22:46:19–20; Surveillance Cam. at 18:46:18–19.) Leake briefly extended his arm towards the firearm as Officer Pantaleon attempted to push him to the ground, and Officer Pantaleon quickly pulled Leake's arm back away from the firearm. (*See*

---

[9] At this point, Officer Pantaleon's body-worn camera becomes intermittently obscured as Leake and Officer Pantaleon engage in a physical struggle and are in close proximity.

[10] The angles of both the laundry room security camera and Officer Pantaleon's body worn camera are such that neither captures the firearm falling to the ground, but Leake does not appear to contest that the firearm fell from his person. The laundry room camera footage does show a firearm appearing near the doorway of the laundry room during the scrum, and, on Officer Pantaleon's now activated body-worn camera footage, someone can be heard to say "gun!, gun!," which is consistent with Officer Pantaleon's testimony that Officer Follman was alerting him to the presence of a firearm. (Mar. 5 Tr. 73:15–19; Pantaleon BWC at 22:46:06–10.)

Pantaleon BWC at 22:46:19–20.)[11]  At that point, Officer Follman pushed the firearm underneath the vending machine and out of Leake's reach.  (*See* Mar. 5 Tr. 75:1–2; Pantaleon BWC at 22:46:20–21.)

Leake and the officer continued flailing about on the floor of the laundry room for approximately two and a half more minutes before the officers were finally able to restrain Leake.  (*See* Pantaleon BWC at 22:46:22–48:55; Follman BWC, Gov't Ex. 1B, at 22:46:19–48:55; Surveillance Cam. at 18:46:20–48:52.)  Leake was "actively resisting" the officers at every turn, by "kicking," "stiffening up his arms," "pulling," and "doing everything he c[ould] to get away from" them.  (Mar. 5 Tr. 76:7–9.)[12]  The officers repeatedly told Leake to place his arms behind his back and Leake resisted doing so, such that even after Officer Follman was able to get a hold of both of Leake's wrists in order to handcuff them, Leake managed to pull both of his arms out of Officer Follman's grasp.  (*See* Pantaleon BWC at 22:46:43–47:50.)  And throughout this melee, the plastic baggie remained in Leake's right hand, until he eventually dropped it on the ground in his effort to resist being handcuffed.  (*See* Pantaleon BWC at 22:47:03–47:50.)  Leake tried to pull away from the officers even after they had managed to handcuff him.  (*See* Pantaleon BWC at 22:48:05–50:50.)

Leake was then subjected to a search incident to his arrest.  As the officers held Leake down, Officer Follman opened a black case that Leake had dropped when Officer Pantaleon first approached him.  (*See* Pantaleon BWC at 22:50:00–03.)  Inside the case

---

[11] Leake disputes that he tried to reach for the firearm, but the body-worn camera footage corroborates Officer's Pantaleon's testimony as to that fact.  (*See* Mar. 5 Tr. 74:22; Pantaleon BWC at 22:46:19–20.)

[12] The body-worn camera footage from both officers corroborates Officer Pantaleon's testimony about this prolonged, physical altercation.  (*See* Pantaleon BWC at 22:46:22–48:55; Follman BWC at 22:46:19–48:55.)

was a large plastic bag filled with a white substance that was later identified as 50.54 grams of cocaine hydrochloride.  (*See* Gov't Mem. in Opp'n to Def.'s Mot. ("Gov't Opp'n"), ECF No. 20, at 5.)  The small plastic baggie that Leake had dropped during the scrum contained what was later determined to be 2.427 grams of heroin.  (*See id.*)  And when they searched Leake's person, the officers recovered a brown tissue that contained a "white rock-like substance" that was later determined to be .203 grams of heroin.  (*Id.* at 5.)  Leake was also carrying "30 packets of Buprenorphine and Naloxone Sublingual Film[,]" a white plastic bag containing a "white rock-like substance" later determined to be 3.122 grams of cocaine base, and "$700.00 in U.S. currency."  (*Id.* at 5–6.)

## II.   LEGAL ANALYSIS

Leake was indicted on June 6, 2019, of having committed four offenses that violate federal law:  (1) possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g);  (2) possession with intent to distribute twenty-eight grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); (3) possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (4) possession of a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1).  (*See* Indictment, ECF No. 1.)  Leake's opposed motion to suppress the tangible evidence that the officers collected ripened on February 3, 2020.  (*See* Def.'s Mot., ECF No. 18; Gov't Opp'n, ECF No. 20; Def.'s Reply, ECF No. 21.)

In his motion, Leake argues, first, that all of the tangible evidence in his case should be suppressed because it was procured as a result of the MPD officers' unlawful

entry into the 601 Building's laundry room.  (*See* Def.'s Reply at 1–2.)  Leake further

insists that his own Fourth Amendment rights were violated because Officer Pantaleon's

initial seizure of him amounted to a warrantless arrest without probable cause (*see*

Def.'s Mot. at 1–2), and because the officers used excessive force when arresting him

(*see* Def.'s Mot. at 3–4).  These suppression arguments thus turn on three legal issues:

whether Leake has standing to challenge the constitutionality of the police officers'

presence in the apartment building's laundry room; whether there was insufficient

reasonable suspicion or probable cause for Officer Pantaleon's seizure of Leake; and

whether excessive force was used to restrain Leake in violation of his constitutional

rights.  As explained below, the Court concludes that the answer to each of these

questions is no, and as a result, Leake's motion to suppress must be denied.

> ### A.   Leake Lacks Standing To Challenge The Police Officers' Presence In The Apartment Building's Laundry Room
>
> #### 1.   <u>A Person May Only Invoke The Exclusionary Rule To Suppress Evidence Procured Through A Violation Of His Own Fourth Amendment Rights</u>

The Fourth Amendment provides, in relevant part, that the "right of the people to

be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated and no warrants shall issue, but upon probable

cause."  U.S. Const. amend. IV.  "[W]arrantless searches are presumed to be

unreasonable"; therefore, "law enforcement officers generally must first obtain a

judicial warrant before searching a person or a person's property for evidence of

criminal wrongdoing" unless a specific exception to the warrant requirement applies.

*United States v. Wills*, 316 F. Supp. 3d 437, 444 (D.D.C.), *reconsideration denied*, 320

F. Supp. 3d 140 (D.D.C. 2018).  If "evidence [is] obtained in violation of the Fourth

Amendment[,]" the courts may apply the "exclusionary rule[,]" which "prohibits the government from introducing [the unlawfully obtained evidence] in its case in chief." *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015).  However, and importantly, "[w]hether a warrant is required is a separate question from . . . whether the person claiming a constitutional violation has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018).  And it is well established that in order to invoke the exclusionary rule to suppress evidence procured through a violation of the Fourth Amendment, it is one's *own* rights that must have been violated—that is, a person may not invoke the exclusionary rule to vindicate the rights of a third-party who suffered an unreasonable search or seizure.  *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978); *see also Byrd*, 138 S. Ct. at 1526; *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).  A defendant who is unable to establish that the evidence at issue was unlawfully procured through a violation of his own Fourth Amendment rights is sometimes said to lack "standing" to seek suppression of that evidence.  *Byrd*, 138 S. Ct. at 1530.[13]

In order to determine whether a person has standing to challenge a warrantless search and seek suppression of the resulting evidence—that is, whether a person has a cognizable Fourth Amendment right that was infringed when the evidence was

---

[13] The Supreme Court has explained that the definition of Fourth Amendment rights as personal rights "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Rakas*, 439 U.S. at 140.  Accordingly, although "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; . . . it should not be confused with Article III standing[.]" *Byrd*, 138 S. Ct. at 1530.  For the ease of the instant discussion, however, the Court will refer to a person's ability to invoke the exclusionary rule with respect to a Fourth Amendment violation as having standing to do so.

procured—courts consider two different, yet intertwined theories.  First of all, a person

may have a common-law property interest and may claim that the law enforcement

officers unlawfully invaded that interest.  *See, e.g., United States v. Jones*, 565 U.S.

400, 406 (2012) (finding that the Government violated the Fourth Amendment where,

pursuant to an invalid warrant, it physically intruded on the defendant's property by

placing a GPS monitor on the defendant's car).  A person might also claim to have a

reasonable expectation of privacy that the officers unlawfully invaded.  *See, e.g.*, *Katz*

*v. United States*, 389 U.S. 347, 352 (1967) (finding that the defendant's Fourth

Amendment right to privacy was violated where the Government, without a warrant,

used a recording device to capture a conversation occurring inside of a telephone

booth); *id.* at 360 (Harlan, J., concurring) (identifying the majority's test as one of a

"reasonable expectation of privacy").  The Supreme Court has explained that the

reasonable expectation of privacy test "supplements, rather than displaces the

traditional property-based understanding of the Fourth Amendment."  *Byrd*, 138 S. Ct.

at 1526.  Thus, these two theories can overlap—for example, a person who has a

common-law property interest often also has a reasonable expectation of privacy in the

property itself, such as the expectation of privacy that comes with ownership of a home.

*See id.* at 1527 ("[O]ne who owns and possesses a house[] almost always has a

reasonable expectation of privacy in it.").  But the two theories may also operate

separately—for example, a person might have a reasonable expectation of privacy in

property they do not own, such as an overnight guest in a friend's home.  *See Jones v.*

*United States*, 362 U.S. 257, 259 (1960).

With respect to the first theory and the concomitant determination of whether a person's common-law property interest has been invaded, "Fourth Amendment jurisprudence [is] tied to common-law trespass[.]" *Jones*, 565 U.S. at 405. The Supreme Court has not opined specifically on the scope of the relevant property interest in the Fourth Amendment context. *See, e.g.*, *Byrd*, 138 S. Ct. at 1531 (Thomas, J., concurring) (noting that there is an undecided threshold issue of "what body of law determines whether [a] property interest is present—modern state law, the common law of 1791, or something else?"). However, at least one circuit has endorsed the Restatement (Second) of Torts definition, *see United States v. Sweeney*, 821 F.3d 893, 900 (7th Cir. 2016), which defines "trespass" as "intentionally [] enter[ing] land *in the possession* of the other[.]" Restatement (Second) of Torts § 158 (emphasis added). The Restatement further explains that "possession" is "occupancy of land with intent to control it" and "occupancy" means to "manifest a claim of exclusive control of the land[.]" *Id*. § 157. As the Seventh Circuit summarizes these concepts, "one must have possession of the property in question and the ability to exclude others from entrance onto or interference with that property." *Sweeney*, 821 F.3d at 900; *cf. Byrd*, 138 S. Ct. at 1527 ("One of the main rights attaching to property is the right to exclude others, and, in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." (internal quotation marks and citation omitted)).

It is also noteworthy that a person's privacy interest in real property extends to the "curtilage"—defined as the area "immediately surrounding and associated with the home[,]" *Florida v. Jardines*, 569 U.S. 1, 6 (2013)—which typically includes the front

14

porch or a side garden, *see id.* at 6–7.  And when presented with a novel question of

whether or not a particular area constitutes curtilage, courts analyze four factors:

"(1) the proximity of the area to the home; (2) whether the area is within an enclosure

surrounding the home; (3) the nature and uses to which the area is put; and (4) the steps

taken by the resident to protect the area from observation by passersby[.]"  *United*

*States v. Dunn*, 480 U.S. 294, 301 (1987).

Under the second theory of Fourth Amendment standing, a reasonable

expectation of privacy exists where a person exhibits a subjective expectation of

privacy, but only if that expectation is one that society is prepared to recognize as

reasonable.  *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J.,

concurring); *see also Byrd*, 138 S. Ct. at 1526 (explaining that the reasonable

expectation of privacy test "derive[s] from . . . Justice Harlan's concurrence in *Katz*").

As relevant to the instant matter, the Supreme Court has not addressed directly whether

there is a reasonable expectation of privacy in communal areas of a multi-unit dwelling.

However, the weight of circuit-level authority holds that a tenant does not have a

reasonable expectation of privacy in the common areas of such a building.[14]  This

---

[14] *See, e.g.*, *United States v. Correa*, 653 F.3d 187, 191 (3d Cir. 2011) (concluding that there is not a
reasonable expectation of privacy in unlocked as well as locked common areas of a multi-unit building
because any other resident could admit guests or others into the common areas, and the defendant could
not control access to these areas); *United States v. Rheault*, 561 F.3d 55, 61 (1st Cir. 2009) (finding
that there was no reasonable expectation of privacy in a common area due to the distance from the
defendant's second-floor apartment to the third-floor common area, and tenants' and guests' frequent
access to the third-floor common area, and the inability of defendant-tenant to exclude others from the
area); *United States v. Villegas*, 495 F.3d 761, 768 (7th Cir. 2007) (finding no reasonable expectation
of privacy where other tenants' guests and customers could access common area of a duplex); *United
States v. Miravalles*, 280 F.3d 1328, 1333 (11th Cir. 2002) (finding that tenants in a "large, high-rise
apartment building, the front door of which has an undependable lock that was inoperable on the day in
question," have no reasonable expectation of privacy because the public at large could enter building's
common areas);  *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999) (finding no reasonable
expectation of privacy where there was no possessory interest in the common area, other tenants had
access, and defendant failed to show that he had made efforts to exclude others from the area); *see also
United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993) (quoting findings of court in *United States*

holding is typically reached after a fact-intensive inquiry about the particular spaces at issue, but whether or not a tenant can exclude others from accessing the common areas, and whether the common areas are open to either the general public or at least to guests of other tenants, are often determinative of the reasonable expectation of privacy issue. For example, in *United States v. Anderson*, 533 F.2d 1210 (D.C. Cir. 1976), the D.C. Circuit held that a tenant had no reasonable expectation of privacy in the common corridors of a rooming house because the corridors were accessible to "residents of the rooming house, their guests, people making deliveries, and others who had a legitimate reason to be on the premises." *Anderson*, 533 F.2d at 1214. And the panel further explained that, because the defendant's "constitutionally protected privacy interest began at the door to [his room] rather than at the door to the entire rooming house[,]" it was unnecessary to determine whether the police officers had a constitutionally sufficient reason for entering the building without a warrant. *Id.* [15]

---

[*v. Eisler*], 567 F.2d 814, 816 (8th Cir. 1977), that a tenant in an apartment complex had no reasonable expectation of privacy in a common area where other residents and their guests could enter); *United States v. Barrios-Moriera*, 872 F.2d 12, 14–15 (2d Cir. 1989) (finding no legitimate expectation of privacy in a common hallway of multi-dwelling apartment even when area is bounded by a locked door), *overruled on other grounds by Horton v. California*, 496 U.S. 128 (1990).

[15] It appears that the Sixth Circuit stands alone in recognizing a reasonable expectation of privacy in the common areas of a locked apartment building. *See United States v. Carriger*, 541 F.2d 545, 551 (6th Cir. 1976) (commenting that, in an apartment complex whose main entrance doors are locked, "[a] tenant expects other tenants and invited guests to enter in the common areas of the building, but he does not expect trespassers"). Although, notably, the Sixth Circuit's holding appears to turn on whether the exterior doors are secured, and its expectation-of-privacy reasoning does not extend to *un*locked apartment buildings. *See United States v. Dillard*, 438 F.3d 675, 684 (6th Cir. 2006) (declining to conclude that there is a reasonable expectation of privacy in the common areas of a multi-unit building when the external doors are unlocked).

2. Leake Cannot Seek Suppression On The Basis Of The Officers'
Alleged Trespass, Because The Officers' Entry Into The Laundry
Room Did Not Violate Leake's Own Fourth Amendment Rights

Given the legal standards that apply to the determination of whether or not Leake

can invoke the exclusionary rule and seek suppression of the evidence against him on

the grounds that the police officers had entered the 601 Building's laundry room

unlawfully (*see supra* Part II.A), this Court can confidently conclude that Leake lacks

standing to argue for suppression, for several reasons.

First of all, Leake does not have a common-law property interest in the 601

Building's laundry room.  Nothing in the record establishes that Leake owns the 601

Building outright, nor has he shown that he leases the entire building or otherwise has

exclusive control over the 601 Building and its laundry room such that he may exclude

others.  *See Jones*, 565 U.S. at 405 (quoting *Entick v. Carrington*, 95 Eng. Rep. 807

(C.P. 1765), for the proposition that "no man can set his foot upon his neighbour's

[property] without his leave; if he does he is a trespasser"); *see also Sweeney*, 821 F.3d

at 900 (explaining that "[o]nly the building owner or landlord could bring suit" against

a trespasser in a multi-unit dwelling and collecting cases thereto).  Indeed, it is not even

clear that Leake has a common-law property interest in any of the buildings in

Edgewood Commons, much less the 601 Building, where the laundry room at issue was

located.  (*See* Mar. 5 Tr. 24:17–25:3 (Ms. Branham testifying that Leake lives with his

aunt in the 525 Building but noting that she has no knowledge of whether or not Leake

is listed on the lease of his aunt's apartment).)

Even if Leake was considered to be an invited guest of a resident of the 601

Building who can thereby assert the common-law property interests of an actual tenant

(i.e., those of his host), *see Collins v. Virginia*, 138 S. Ct. 1663, 1668 n.1, 1671 (2018)

17

(suggesting that a *guest* has the same property interest in his host's home and its curtilage as his host), as defense counsel argues (*see* May 5 Tr. 14:15–15:11),[16] it is clear to this Court that the laundry room of the 601 Building is not an area with respect to which Leake (or his host) has the right to exclude others for the purpose of the Fourth Amendment's privacy analysis.  That is, the evidence would have to demonstrate that the 601 Building's laundry room is so "intimately linked . . . physically and psychologically" to an individual apartment that it constitutes curtilage for Fourth Amendment purposes.  *Jardines*, 569 U.S. at 7 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).  But the laundry room in the 601 Building appears to be a quintessential common area of this multi-unit residence and common areas are generally considered to be outside the protected curtilage of a private residence.  *See, e.g.*, *United States v. Jones*, 893 F.3d 66, 72 (2d Cir.), *cert. denied*, 139 S. Ct. 468 (2018) (finding

---

[16] Leake solicited testimony from Ms. Branham, who resides in an apartment in the 601 Building, in support of his contention that he was a guest of Ms. Branham's and thus has Fourth Amendment standing in the 601 Building (*see, e.g.*, Mar. 5 Tr. 11:19–12:24); and, during the motion hearing the Court held on May 5, 2020, the Government conceded that Leake was a guest for Fourth Amendment purposes with respect to Ms. Branham's apartment in the 601 Building (*see* May 5 Tr. 42:10–16). Nevertheless, it is not clear to this Court that Leake was a guest of Ms. Branham, or any other particular resident of the 601 Building, *on the day of his arrest*, which, in this Court's view, is relevant to the discussion of whether a guest has any meaningful relationship with his host's property for the purposes of the Fourth Amendment.  *See Minnesota v. Carter*, 525 U.S. 83, 91 (1998) (suggesting that the defendant's *legitimate* presence in the host's home is a factor in assessing whether a guest can claim the protection of Fourth Amendment).  And even assuming that Leake was a guest at the time of the events in question, it is not at all clear that a guest has the same enforceable property rights as a tenant.  The Supreme Court in *Collins* did not *decide* that a guest can assert his host's common-law property rights to vindicate an alleged trespass; rather, the Court specifically noted that the State of Virginia had *conceded* that "Collins ha[d] Fourth Amendment standing."  *Collins*, 138 S. Ct. 1663, 1668 n.1 (2018).  And while the Supreme Court also cited *Minnesota v. Olson*, a case which holds that an "overnight guest" has a reasonable expectation of privacy in his host's home, *see* 495 U.S. 91, 96–100 (1990), it did not engage in any meaningful discussion of whether a guest also inherits his host's common-law property interest, because Virginia did not contest that issue.  *See id.* at 1676 n.1 (Thomas, J., concurring) ("Collins did not live at the house; he merely stayed there with his girlfriend several times a week.  But Virginia does not contest Collins' assertion that the house is his, so I agree with the Court that Virginia has forfeited any argument to the contrary.").  *But see United States v. Bain*, 874 F.3d 1, 13 (1st Cir. 2017) (holding that an overnight guest may "maintain a common law trespass claim").

that a "common area accessible to other tenants" was not a part of the curtilage because defendant "could not reasonably expect that it should be treated as part of his private home" and defendant did not have "exclusive control" over the common area); *Sweeney*, 821 F.3d at 902 (applying the *Dunn* factors to hold that multi-unit dwelling's shared basement laundry room and storage space was not in the curtilage of tenant's apartment).[17]

Indeed, nothing in the instant record indicates that the particular laundry room at issue here should be treated as protected curtilage for Fourth Amendment purposes.  For example, Leake has presented no evidence suggesting that his host's apartment was actually proximately located to the laundry room where Leake was found at the time that the officers confronted him.  *See Dunn*, 480 U.S. at 301; *see also Jardines*, 569 U.S. at 6–7 (emphasizing that curtilage protection pertains to areas that are "adjacent to" and "immediately surrounding" the home, such as a "porch or side garden").  Instead, the laundry room at issue here is *in the basement* of the 601 Building, which itself is a large, multi-story apartment building with more than 200 units.  The laundry room in the 601 Building is not "within an enclosure surrounding" *any* of the Edgewood Commons apartments, much less the particular unit where Leake was a guest.  *Dunn*,

---

[17] As a reminder, the *Dunn* factors help a court to determine whether an area qualifies as curtilage by assessing "the proximity of the area to the home"; "whether the area is within an enclosure surrounding the home"; "the nature and uses to which the area is put"; and "the steps taken by the resident to protect the area from observation[.]"  *Dunn*, 480 U.S. at 301.  Applying those factors, courts have consistently concluded that communal areas outside one's own apartment are not properly considered curtilage for Fourth Amendment purposes.  *See also United States v. Jackson*, 728 F.3d 367, 374 (4th Cir. 2013) (applying *Dunn* factors to find that a "common courtyard area" was not within an individual apartment's curtilage); *United States v. Brooks*, 645 F.3d 971, 976 (8th Cir. 2011) (holding that staircase leading to basement common area was not in the curtilage of tenant's apartment); Carol A. Chase, *Cops, Canines, and Curtilage: What Jardines Teaches and What It Leaves Unanswered*, 52 Hous. L. Rev. 1289, 1305 (2015) (analyzing cases and finding that "the overwhelming weight of authority rejects the proposition that a resident of a multi-dwelling residential building can claim curtilage protection in common areas").

480 U.S. at 301; *see also Sweeney*, 821 F.3d at 902 (explaining that "the [curtilage] question is not whether the area at issue was within the walls of the building, but whether it was enclosed and intimate to [the] apartment itself").  Moreover, the motion hearing testimony and video footage indisputably established that all tenants must exit their apartments and traverse common corridors to reach the 601 Building's laundry room—a fact that makes it next to impossible to conclude that that common area qualifies as curtilage that gives rise to protectible privacy interests.  *See, e.g.*, *United States v. Jackson*, 728 F.3d 367, 374 (4th Cir. 2013) (finding that an apartment complex's common area was outside of the curtilage of an individual unit because it was clearly distinguished from an individual tenant's property line).

To be sure, as a general matter, a laundry room is in the nature of an area that commonly exists *inside* a home.  *See Dunn*, 480 U.S. at 301 (establishing that one factor of curtilage determination is "the nature and uses to which the area is put").  But the laundry room at issue here is not treated as a private extension of any tenant's residential space; instead, it is open to use by all residents and guests of the Edgewood Commons complex, and there is no indication that any one resident can exclude anyone else from that area (as one would be able to do while undertaking to do laundry inside one's own apartment).  The indisputable common-area character of the laundry room in the 601 Building thus renders defense counsel's efforts to distinguish this area from other common areas of the 601 Building entirely unpersuasive.  (*See* May 5 Tr. 20:8–22 (counsel arguing that a laundry room encompasses more intimate activities than other types of common areas).)  And it also appears that Leake did not even *try* to exclude others from the laundry room while he was in it.  *See Dunn*, 480 at 301 (inquiring as to

whether the person with the purported property interest took measures "to protect the area from observation by passerby").  That is, the video footage of the events surrounding Leake's arrest clearly shows people coming and going from the laundry room; the door was not closed and access was not otherwise barred, and the interior of the room was observable to anyone who walked through the hallway or who entered through the laundry room door.

This Court also rejects the contention that Leake had a reasonable expectation of privacy in the laundry room of this multi-unit apartment building, separate and apart from whatever property interest he might have as the guest of a tenant of Edgewood Commons.  As explained above, courts have consistently concluded that there is no reasonable expectation of privacy in the common areas of a multi-unit dwelling, which are open for use by residents and their guests.  (*See supra* note 14.)  Furthermore, it is clear on the instant facts that the large laundry room in the unlocked basement of the 601 Building was not only open to tenants and their guests but also, effectively, to the public at large.  In the camera footage that both parties submitted in this case, any of the myriad people who enter and exit that room can see plainly that Leake was standing in the corner, fiddling with something in his hands.  Thus, this Court has little trouble concluding that to expect privacy in a laundry room that is so fully accessible to tenants, guests, and the public is not "[an expectation] that society is prepared to recognize as 'reasonable.'"  *Minnesota v. Olson*, 110 S. Ct. 1684, 1687 (1990).

To the extent that Leake relies on Justice Jackson's concurrence in *McDonald v. United States*, 335 U.S. 451 (1948), for the proposition that a person's Fourth Amendment rights are violated merely due to a police officer's alleged unlawful

"breaking and entry" in order to gain access to a building (*see* Def.'s Notice of Add'l Auths., ECF No. 29, at 1–2), this Court notes that Fourth Amendment jurisprudence has evolved significantly since *McDonald*, and, indeed, the *McDonald* ruling predates the Supreme Court's seminal opinion in *Katz*.  Moreover, every one of the courts of appeals that has addressed the issue of common areas has found, post *McDonald*, that there is no reasonable expectation of privacy in such common areas of an apartment building, and that appears to be so no matter how the officers entered.[18]  Therefore, this Court concludes that Leake does not have a protectable property interest in the laundry room of the 601 Building, nor did he have any reasonable expectation of privacy with respect to his activities in the common area of such a multi-unit residential building, and as a result, Leake lacks Fourth Amendment standing to challenge the officers' presence, regardless of whether their entry into the building and/or the laundry room violated the Fourth Amendment.  *See Anderson*, 533 F.2d at 1214.

### B.    Officer Pantaleon Had Sufficient Cause To Seize Leake

Leake next argues that an unreasonable seizure of his person in violation of the Fourth Amendment occurred at the moment that Officer Pantaleon grabbed his arm, because Officer Pantaleon did not have a warrant or probable cause to effect that seizure.  (*See* Def.'s Mot. at 1–2.)  But as explained below, the Court concludes that Officer Pantaleon's initial seizure of Leake was a permissible investigatory stop (thus it required only reasonable suspicion), and at the point in which the stop became an arrest,

---

[18] It is also far from clear that Officers Pantaleon and Follman actually entered the 601 Building unlawfully.  (*See* Def.'s Reply at 1, 4 (arguing that the officers' warrantless entry into the 601 Building was an unlawful trespass).)  As this Court has already found, Officer Pantaleon had visited the 601 Building on multiple prior occasions, with the encouragement and consent of the building security, and thus he may very well have had a legitimate right of access.

Officer Pantaleon had sufficient probable cause to make an arrest.  Therefore, Officer Pantaleon's seizure of Leake did not violate the Fourth Amendment.

### 1.   Officer Pantaleon Did Not Need Probable Cause To Seize Leake At The Outset

A seizure of a person occurs for Fourth Amendment purposes when a law enforcement officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  The Fourth Amendment protects persons against unreasonable seizures by law enforcement, which means, at a minimum, that any such seizure must "be founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (citation omitted).  If a warrantless seizure of a person occurs, probable cause to believe that the person has committed a crime is generally the required justification, *see Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003); however, in *Terry v. Ohio*, the Supreme Court announced a limited exception to this probable cause requirement.  *See Terry*, 392 U.S. at 20; *see also Dunaway v. New York*, 442 U.S. 200, 209 (1979).  In *Terry*, the Supreme Court held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30).  This brief stop based upon reasonable articulable suspicion has come to be widely known as a "*Terry* stop." *Id.* at 126; *see also, e.g.*, *United States v. Place*, 462 U.S. 696, 705 (1983); *United States v. Rasberry*, 882 F.3d 241, 246 (1st Cir.), *cert. denied*, 139 S. Ct. 591 (2018).

It is also well established that "reasonable articulable suspicion" exists where there are "specific and articulable facts" that, when considered together with the

rational inferences from those facts, indicate that criminal activity may have occurred or may be occurring. *Terry*, 392 U.S. at 21, 30; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (noting that "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause").  Courts that are called upon to decide after the fact whether a police officer had a reasonable suspicion consider the "totality of the circumstances . . . to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  "[A] single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, [but] the combination of several factors—especially when viewed through the eyes of an experienced officer— may." *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001).

The Government here does not contest that Leake was seized for Fourth Amendment purposes when Officer Pantaleon cornered him between the vending machines and grabbed his arm.  But Leake argues that this seizure amounted to an arrest, and thus required probable cause (*see* Def.'s Mot. at 2; May 5 Tr. at 34:9–10), while the Government maintains that Leake was merely subject to an investigatory *Terry* stop and that the encounter only escalated to an arrest after the firearm fell from Leake's person (*see* Gov't Opp'n at 11).  Thus, the first step in deciding whether or not Officer Pantaleon's initial act of grabbing Leake transgressed the Fourth Amendment is to determine the nature of this seizure—i.e., investigatory stop or arrest—in order to pinpoint the requisite level of suspicion necessary to justify that seizure of Leake's person.

"The point at which an investigative stop becomes an arrest is not marked with a bright line" but "the [Supreme] Court has 'emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" *Hall v. D.C.*, 867 F.3d 138, 153 (D.C. Cir. 2017) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).  It is important to note that, physical contact does not, in and of itself, convert a *Terry* stop into an arrest.  *See United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976) (holding that an officer can grab the defendant's arm and then handcuff the defendant in order "to maintain the status quo momentarily while obtaining more information"); *see also United States v. Castle*, 825 F.3d 625, 633 (D.C. Cir. 2016) (analyzing whether an officer had reasonable suspicion to support a *Terry* stop where the officer ordered defendant to remove hands from pocket and "initiated physical contact" by touching defendant's arm); *United States v. Smith*, 373 F. Supp. 3d 223, 237 (D.D.C. 2019) (finding that a "valid *Terry* stop" occurred where officers approached defendant and "grabbed his arm").  Indeed, the investigatory stop-or-arrest assessment is a more nuanced one, requiring consideration of "the officer's intent in stopping the citizen; the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made." *United States v. White*, 648 F.2d 29, 34 (D.C. Cir. 1981) (citations omitted).  "[A] stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall*, 867 F.3d at 153.

Given these considerations, this Court finds that Officer Pantaleon's initial seizure of Leake did not amount to an arrest, and, therefore, probable cause was not

required.  To begin with, Leake had positioned himself in a very suspicious manner in the laundry room when Officer Pantaleon first caught sight of him.  Both Officer Pantaleon's testimony and the body-worn camera footage show that Leake was standing facing the wall, inches from the corner, at the far end of the laundry room, and in between two vending machines.  (*See* Mar. 5 Tr. 58:18–21, 68:2–3; Pantaleon BWC at 22:45:01–08.)  It is also patently obvious that Leake was looking down at his hands, which were holding something.  (*See* Mar. 5 Tr. 68:9–11; Pantaleon BWC at 22:45:06–08.)  Officer Pantaleon approached Leake, and caught his attention from behind, at which point Leake turned to look at him, revealing that he had a small clear plastic baggie in his hand.  (*See* Mar. 5 Tr. 68:16–69:8; Pantaleon BWC at 22:45:09–10.)  This brief exchange and series of observations were enough to cause an officer who has experience with identifying narcotics sales to suspect illegal activity and do what Officer Pantaleon did—which was to grab Leake's arm to "stop him[.]"  (Mar. 5 Tr. 69:18.)  And based on the video footage, Officer Pantaleon's act of grabbing Leake's arm was not unduly intrusive such that it became an arrest of Leake's person.  *See Purry*, 545 F.2d at 220 (explaining that an officer may conduct a *Terry* stop by physically restraining a defendant momentarily to "obtain[] more information").

Leake's reliance on a case from the District of Columbia Court of Appeals, *Upshur v. United States*, 716 A.2d 981 (D.C. 1998), to insist that the Fourth Amendment required that Officer Pantaleon have a reason to believe that Leake was armed and dangerous prior to the seizure (*see* May 5 Tr. 32:12–33:6; Def.'s Notice of Add'l Auths. at 3) is misplaced.  In *Upshur*, the D.C. Court of Appeals found that the defendant's Fourth Amendment rights were violated where the officer "immediately

26

grabbed [defendant] and conducted a search of his closed fist, attempting to force his fist open to see what he held without specific and articulable facts from which it could be inferred reasonably that appellant was armed and presently dangerous." *Upshur*, 716 A.2d at 985.  But, Officer Pantaleon did not grab Leake's arm in order to conduct a search; instead, he grabbed Leake to stop him after observing what was, in his training and experience, a baggie containing narcotics.  (*See* Mar. 5 Tr. 69:18.)  And, importantly, when Officer Pantaleon grabbed Leake's arm, he did not manipulate Leake's arm to conduct a search and thereby discover unobserved evidence of criminal activity. *Cf. Upshur*, 716 A.2d at 985 (explaining that officers had not viewed narcotics in defendant's hand and thus conducted an impermissible search when they grabbed his arm and forced his hand open).

The video footage that was submitted in this case also plainly reveals that after Officer Pantaleon first made physical contact with Leake by grabbing his arm, Leake then pushed around Officer Pantaleon in order to flee.  To prevent this attempted flight (which would certainly have impeded Officer Pantaleon's investigation), Officer Pantaleon attempted to restrain Leake, and Officer Follman subsequently joined in the effort while Leake struggled to break free.  The D.C. Circuit has explained that "[l]evels of force and intrusion in an 'investigatory stop' may be legitimately escalated to meet supervening events, such as attempted flight[.]"  *White*, 648 F.2d at 40.  And given that these officers had to engage in a full-fledged physical altercation with Leake in order to prevent his flight so that the initial investigation could continue, this Court cannot find that their actions were "unduly prolonged or intrusive" such that the investigatory stop was converted into an arrest.  *Hall*, 867 F.3d at 153.

2.  Officer Pantaleon Had A Reasonable, Particularized, And Objective
    Basis For Suspecting Wrongdoing And Seizing Leake

In addition to concluding that Leake's initial seizure qualified as an investigatory stop, rather than an arrest, the Court further finds that there was sufficient justification for Officer Pantaleon to execute such a stop of Leake.  To use the parlance of the applicable case law, given the totality of circumstances, Officer Pantaleon had "specific and articulable facts which, taken together with rational inferences from those facts," gave rise to a reasonable suspicion that "criminal activity [was] afoot[.]"  *Terry*, 392 U.S. at 21, 30; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (explaining that the court must consider the "totality of the circumstances . . . to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing").

Specifically, these facts include that the officers were on patrol in a high crime area (*see* Mar. 5 Tr. 145:2); that Officer Pantaleon observed Leake standing closely to and facing the wall in the corner of the laundry room between two vending machines in an apparent effort to conceal himself (*see* Mar. 5 Tr. 58:19–21, 68:2–3; *see also* Pantaleon BWC at 22:45:01–08); that Leake was looking closely at something in his hands (*see* Mar. 5 Tr. 68:11; *see also* Pantaleon BWC at 22:45:06–08); that, as Officer Pantaleon walked closer to Leake, the item in Leake's hands—a small clear plastic baggie that contained a powdered substance—became momentarily visible (*see* Mar. 5 Tr. 60:14–15, 69:7–8; *see also* Pantaleon BWC at 22:45:09–10); and that Officer Pantaleon reasonably believed the powdered substance was illegal narcotics, consistent with his training and experience (*see* Mar. 5 Tr. 60:16–19, 69:9–13).  And although any one of these known facts could certainly have had an individual, innocent explanation,

28

the Court must consider them in their totality, *see Edmonds*, 240 F.3d at 60, and in doing so, this Court finds that this set of circumstances was sufficient to provide a reasonable officer with a particularized and objective basis for suspecting criminal wrongdoing, and as such, Officer Pantaleon's initial seizure of Leake was properly justified.

### 3.  The Officers Had Probable Cause To Arrest Leake

There is no dispute that the initial investigatory stop of Leake eventually became a warrantless arrest (which then gave rise to the search incident to arrest that yielded the evidence that Leake says must be suppressed); consequently at some point in this encounter, Officers Pantaleon and Follman were required to have probable cause to believe that Leake had committed a crime.  Probable cause exists when, under the totality of circumstances, there is a "fair probability" that a crime has been committed. *Florida v. Harris*, 568 U.S. 237, 244 (2013).  And "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Under established Fourth Amendment jurisprudence, the reasonable suspicion that led Officer Pantaleon to confront Leake at the outset likely also constituted probable cause to arrest Leake for suspected possession of illegal narcotics.  In particular, Officer Pantaleon had observed a powdered substance in a baggie in Leake's hands, which he believed to be narcotics based on training and experience.  *See United States v. Jackson*, 360 F. Supp. 2d 24, 27 (D.D.C. 2003) (finding plain-view observation of narcotics sufficient probable cause).  What is more, it is by now well established that

reasonable suspicion can become probable cause if a defendant attempts to flee an approaching officer. *See United States v. Stubblefield*, 931 F. Supp. 2d 118, 131 (D.D.C. 2013), *aff'd*, 820 F.3d 445 (D.C. Cir. 2016) (collecting cases).  Furthermore, where officers observe a concealed firearm under circumstances that suggested that the weapon is being carried unlawfully—e.g., where the firearm falls from a suspected law breaker's waistband—*that* observation, too, establishes probable cause to arrest.  *See, e.g.*, *United States v. Moore*, 75 F. Supp. 3d 444, 449 (D.D.C. 2014) (finding probable cause where officer in pursuit of fleeing defendant observed gun fall from defendant's waistband); *United States v. Tuten*, 293 F. Supp. 2d 30, 32 (D.D.C. 2003) ("[O]fficers had reasonable suspicion for an investigatory stop and even probable cause for arrest after viewing the gun in plain view.").

Thus, this Court has little trouble finding that Leake was lawfully arrested under the totality of circumstances, because Officers Pantaleon and Follman had probable cause to arrest him given Officer Pantaleon's first-hand observation of Leake's possession of a powdery substance that the officer believed to be narcotics; Leake's flight upon being subjected to an investigatory stop; and a firearm falling from Leake's body during the struggle with the officers.

### C.   The Officers' Use Of Force Was Constitutionally Permissible

Finally, the Court also rejects Leake's contention that the evidence against him must be suppressed due to the officers' use of constitutionally unreasonable force in bringing him to the ground during the seizure of his person.  (*See* Def.'s Mot. at 3–4.) The Supreme Court has recognized that "the right to make an arrest or investigatory stop *necessarily* carries with it the right to use some degree of physical coercion or

threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (emphasis added).  Thus, a court reviewing the reasonableness of the use of force in this context must look to "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.  The factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  And it is clear beyond cavil that, in the course of an investigatory *Terry* stop in particular, a suspect's flight is a sufficient reason for an officer to tackle or force the suspect to the ground in order to stop the flight, and once brought to the ground, an officer may even place the suspect in handcuffs if an officer has reasonable concerns about safety.  *See United States v. Dykes*, 406 F.3d 717, 720–21 (D.C. Cir. 2005).

This Court has no doubt that the force that Officers Pantaleon and Follman used to stop Leake when he attempted to flee and resisted arrest was objectively reasonable. There is no speculation whatsoever regarding Leake's actions when the officer first approached him and the physical force that was eventually applied, because the video captures it clearly: Leake attempted to flee, and he then actively resisted any additional contact with the officers, fighting them physically tooth and nail and refusing to comply with their directions.  Even so, the officers never drew their firearms, nor did they utilize pepper spray or wield any other weapons in their effort to restrain Leake.  They only forced Leake to the ground, and after seeing the gun and pushing it out of the way, they were finally able to put handcuffs on Leake, with his hands behind his back.

Nothing that appears in the three videotaped depictions of the events that the Court received into evidence indicates that Officers Pantaleon and Follman used force in an objectively unreasonable manner.  And, therefore, their use of force to seize and restrain Leake, which, again, was fully captured from various angles on three different videotapes, did not violate Leake's constitutional rights.

### III.    CONCLUSION

For the foregoing reasons, this Court finds that Leake lacks standing to challenge Officers Pantaleon's and Follman's alleged trespass into the 601 Building, and that these officers had both reasonable suspicion and probable cause to seize Leake and then ultimately arrest him on May 28, 2019.  The Court further finds that the manner of Leake's arrest did not involve a constitutionally unreasonable use of force under the circumstances presented.  Therefore, as set forth in the accompanying Order, Leake's motion to suppress the tangible evidence against him on the grounds that it was obtained in violation of the Fourth Amendment (ECF No. 18) must be **DENIED**.

Date:  June 26, 2020                            *Ketanji Brown Jackson*
                                                KETANJI BROWN JACKSON
                                                United States District Judge